**Don MORROW, Appellant,**

**v.**

**DISTRICT OF COLUMBIA, Appellee.**
**In the Matter of Harry T. ALEXANDER,**
**Judge, District of Columbia Court**
**of General Sessions.**

**Nos. 22126, 22131.**

United States Court of Appeals
District of Columbia Circuit.

Argued Feb. 14, 1969.

Decided April 18, 1969.

**39.** Of course we do not intimate any view as to the action to be taken by the District Court upon any such request.

Mr. Ralph J. Temple, Washington, D. C., for appellant in No. 22,126.

Mr. Frank D. Reeves, Washington, D. C., for appellant in No. 22,131.

Mr. John R. Hess, Asst. Corporation Counsel for the District of Columbia, with whom Messrs. Charles T. Duncan, Corporation Counsel, Hubert B. Pair, Principal Asst. Corporation Counsel, and Richard W. Barton, Asst. Corporation Counsel, were on the brief, for appellee.

Before PRETTYMAN, Senior Circuit Judge, and WRIGHT and TAMM, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

This case presents a somewhat tangled series of novel questions concerning the power of the District of Columbia Court of Appeals to restrain the District of Columbia Court of General Sessions from issuing orders outside its jurisdiction, and the jurisdiction of the Court of General Sessions to issue orders prohibiting the dissemination of police records regarding the arrests of persons tried in the Criminal Division of that court. A detailed chronology of the events is necessary to an understanding of these questions.

On August 30, 1967, Don Morrow was arrested and charged with disorderly conduct for swearing at a police officer. 22 D.C.CODE § 1107 (1967). On September 25, 1967, the Corporation Counsel of the District of Columbia brought him to trial in the Criminal Division of the Court of General Sessions, Judge Alexander presiding. Judge Alexander ordered that the case be dismissed because prosecutions under that section of the code can only be brought by the United States Attorney.[1] The Corporation Counsel did not appeal from this dismissal, and the United States Attorney did not seek to prosecute Morrow.

When Judge Alexander ordered the case dismissed, Morrow immediately moved for an order requiring that the record of his arrest in that case be expunged from Police Department files. Judge Alexander issued an oral order instructing the Corporation Counsel not to "disseminate the information pertaining" to Morrow's arrest.[2] The District did not attempt to appeal this order. A month later, on October 26, 1967, the Corporation Counsel requested Judge Alexander to reduce his order to writing. Judge Alexander complied, issuing an order prohibiting the Police Department and other agents of the District from disseminating to anyone, including other law enforcement agencies, the record of Morrow's arrest in the disorderly conduct case.[3] The District made no attempt to appeal from this written order.

---

1. Judge Alexander correctly anticipated this court's subsequent holding in District of Columbia v. Grimes, 131 U.S.App. D.C. 360, 404 F.2d 1337 (1968), in which we held that such prosecutions must be brought by the United States Attorney.

2. A notation was entered on the file jacket that "Corp. Counsel instructed not to disseminate Record of deft's arrest on file in Criminal Records Office."

3. The text of the written order was:
"The District of Columbia and all its agencies and officials, including the Commissioners of the District of Columbia and their agents, and including the Chief of Police of the Metropolitan Police Department of the District of Columbia and all his agents, and including every member of the Metropolitan Police Department of the District of Columbia and their agents are prohibited, effective September 25, 1967, the date on which this Order was first directed to such persons in the presence of their attorney, the Assistant Corporation Counsel of the District of Columbia, from distributing, communicating, transmitting, or otherwise making available or providing information regarding the record or information of the arrest on August 30, 1967, of Mr. Don Morrow, defendant in these proceedings, to any other governmental or private agency or person, including other law enforcement agencies or officials until further order of this Court."

Shortly after this order was entered the Duncan Report [4] was published. This report was the result of a study of the use of arrest records by employers ordered by the District of Columbia Board of Commissioners; Charles T. Duncan, Corporation Counsel for the District, was appointed chairman of the committee to make the study. The Report found that the use of arrest records by prospective employers was widespread, and the consequences of a person having been arrested, even if the charges were subsequently dismissed, were severe. The Report recommended that the Commissioners adopt rules prohibiting the dissemination to employers of records of arrests where no conviction resulted. The Report also recommended, however, that complete arrest records should be disseminated to law enforcement agencies. On November 2, 1967, the Commissioners adopted virtually all of the Report's recommendations, and the recommendations became law 90 days later.[5]

Once the Duncan Report was issued and adopted by the Commissioners, the Corporation Counsel, on November 30, 1967, moved Judge Alexander to amend his original order by limiting it in scope to the Duncan Report (the main change would thus be that the record of Morrow's arrest in this case could be disseminated to other law enforcement agencies). Morrow opposed this motion, and moved to have the order extended to require a physical expunging of the arrest record. Morrow also moved for a subpoena *duces tecum* against the appropriate police official to produce certain records to determine whether the Police Department was complying with Judge Alexander's order.

Judge Alexander denied the District's motion to amend the order, and he issued the subpoena and set a date for a hearing on compliance. The hearing commenced on January 30, 1968. At the beginning of the hearing the District moved to quash the subpoena and also moved to have the order vacated, claiming that the Court of General Sessions had no ancillary jurisdiction to issue any order regarding the dissemination of arrest records.[6] Judge Alexander denied these motions and the hearing began. The police official was questioned extensively about general procedures regarding dissemination of arrest records. The questioning lasted until 10:30 P.M. The hearing was then recessed until February 1, 1968.

At this point the Corporation Counsel moved in the District of Columbia Court of Appeals for an order of mandamus and writ of prohibition; the mandamus was to require Judge Alexander to vacate his order, the writ of prohibition was to restrain him from continuing the hearing or engaging in any other proceedings pursuant to his order. The D. C. Court of Appeals immediately issued, *ex parte,* a temporary restraining order prohibiting Judge Alexander from proceeding with the hearing while the D. C. Court of Appeals considered the motion for mandamus and prohibition. Morrow was allowed to intervene in the subsequent proceedings in the D. C. Court of Appeals.

On July 8, 1968, the D. C. Court of Appeals issued its decision. In the Matter of Alexander, 243 A.2d 901 (1968). It held that it had the power to issue

---

4. The report was entitled "Report of the Committee to Investigate the Effect of Police Arrest Records on Employment Opportunities in the District of Columbia."

5. Minutes of the October 31, 1967 Meeting of the Board of Commissioners (attached as an appendix to this opinion).

6. Perhaps because the Corporation Counsel felt himself in an awkward legal position, he also moved to withdraw his earlier motion to have the order amended to comply with the Duncan Report. This earlier motion was predicated on what the Corporation Counsel believed was the ancillary equitable jurisdiction of the Court of General Sessions to amend its order. This position might have conflicted with the subsequent position that the court had no ancillary equitable power to prohibit dissemination of arrest records. Judge Alexander denied the motion to withdraw the previous motion.

extraordinary writs and that mandamus and prohibition were appropriate in this case because the Court of General Sessions did not have any ancillary jurisdiction in a criminal case to issue orders prohibiting dissemination of arrest records. The D. C. Court of Appeals issued the writs, ordering Judge Alexander to vacate his order.

Judge Alexander and Morrow then petitioned this court to exercise its discretion to grant an appeal from the D. C. Court of Appeals.[7] We did so on September 26, 1968. In his argument to this court Judge Alexander took the position that the D. C. Court of Appeals had no power to issue mandamus or prohibition. He also argued that, assuming such a power, it was inappropriate here. Morrow argued that the D. C. Court of Appeals was wrong on the merits in that Judge Alexander's order was bottomed on proper jurisdiction. The Corporation Counsel conceded before this court that the Court of General Sessions may have some ancillary equitable jurisdiction to issue protective orders in cases before it, but argued that that jurisdiction does not extend to *any* order regarding dissemination of arrest records; therefore the mandamus and writ of prohibition were proper. We have never previously ruled on any of these issues.

We hold: (1) the D. C. Court of Appeals does have power to issue extraordinary writs in supervision of the Court of General Sessions; (2) while normally orders such as Judge Alexander's will be appealable, in this case it was appropriate for the Corporation Counsel to seek, and the D. C. Court of Appeals to act upon, a petition for mandamus and writ of prohibition; and (3) the Court of General Sessions does have ancillary jurisdiction in a criminal case to issue protective orders regarding dissemination of arrest records. Accordingly, we reverse the D. C. Court of Appeals insofar as its decision was rested on the conclusion that no such jurisdiction existed in the Court of General Sessions.[8] However, we do not decide the substantial issue of the proper limits of such an order. Since Judge Alexander denied the Corporation Counsel's motion to amend the scope of his order, and since the D. C. Court of Appeals did not reach this issue, we remand to the D. C. Court of Appeals.[9]

I [10]

The writs of prohibition and mandamus are part of the general class of prerogative or extraordinary writs. The arcane origins of the prerogative

---

7. 17 D.C.CODE § 101 *et seq.* (1967).

8. The D.C. Court of Appeals decision contained some dicta to the effect that the order might have been invalid because it ran against the Police Department. As discussed in Part V, *infra,* the Police Department was properly subject to the order.

9. The hearing which was stayed by the writ of prohibition is further stayed until the D.C. Court of Appeals decides what the proper scope of the order is. It will be open to the parties then to renew their motion for a hearing on compliance, if it is felt the District government is failing to comply with the order as delineated by the D.C. Court of Appeals. In Part V, *infra,* we discuss the proper limited conditions under which such a hearing is called for.

10. By way of preface to the discussion in this Part and the subsequent Parts of this opinion, we note that two different types of judicial power are presented by this case. The first is the power of a court to issue *different types of remedies* to effectuate its conceded jurisdiction over some subject matter (here the power of the D.C. Court of Appeals to issue extraordinary writs of prohibition and mandamus in exercising its appellate control over the Court of General Sessions in criminal matters). The second is the power of a court *to assert jurisdiction over a subject matter different from, but related to,* a matter properly before the court (here the power of the Court of General Sessions to issue orders relating to arrest records in a criminal matter properly before it).

We note this distinction because some commentators refer to both types of power as "ancillary jurisdiction." *See* 1 W. BARRON & A. HOLTZOFF, FEDERAL PRACTICE AND PROCEDURE § 23 (Wright

writs lie within the old common law, where "[a]t a remote date in England these writs were issued by the exercise of the royal prerogative."[11] The writs include, *inter alia, certiorari,* injunction, *habeas corpus,* mandamus, *ne exeat,* prohibition, and *quo warranto.*[12] The function of the writs is varied; in general they are issued in special circumstances to aid in the jurisdiction of a court when normal relief would be unavailing. The prerogative writs are thus means to effectuate a court's jurisdiction; the writs by themselves cannot confer jurisdiction.[13]

Frequently the writs are considered to be tools inherent in an appellate court's power to supervise a lower court.[14] This is so especially when the lower court is felt to be exceeding its jurisdiction. The writ of prohibition in particular often serves this function. Thus "[the writ of prohibition's] principal purpose at the present time is to prevent an encroachment, excess, usurpation, or assumption of jurisdiction on the part of an inferior court or tribunal * * *."[15]

Mandamus is often issued by a court against some public official compelling him to perform a ministerial duty.[16] However, it has also been used by a higher court to compel certain positive action by a lower court:

"The traditional use of the writ [of mandamus] in aid of appellate jurisdiction both at common law and in the

federal courts has been to * * * compel [an inferior court] to exercise its authority when it is its duty to do so. * * * "[17]

In a sense mandamus is the counterpart of the writ of prohibition in that "one is prohibitory and the other mandatory,"[18] and they are often, as here, used together by a higher court to bring a lower court back within its jurisdiction.

In two prior cases the D. C. Court of Appeals has asserted its power to issue extraordinary writs. United States v. Kronheim, D.C.Mun.App., 80 A.2d 280 (1951); Mike's Mfg. Co. v. Zimzoris, D.C.Mun.App., 66 A.2d 414 (1949). As stated, this is the first time we have been presented with this question, and we agree with the D. C. Court of Appeals that it has this power on two grounds.

First, we agree with the statement in *Zimzoris, supra,* 66 A.2d at 415, that:

" * * * The Act creating the [D. C. Court of Appeals] does not expressly give such power, but we think this Court being expressly authorized to hear and determine appeals and to regulate all matters relating to such appeals, has implied or inherent power to issue extraordinary writs in aid of its appellate jurisdiction. * * * "

The D. C. Court of Appeals is given by statute the power of direct appellate review over the Court of General Sessions. 11 D.C.CODE § 741 (1967). It is the sole

ed. 1960). We think the term "ancillary jurisdiction" is more appropriate to the latter power—it connotes the court taking jurisdiction in a matter over which, but for a pending matter, it would have no jurisdiction. The former power is more appropriately seen as involving the form or style of relief granted by a court regarding a subject matter independently within its jurisdiction.

11. 72 C.J.S. Prerogative Writs 488 (1951).

12. *Ibid. See also* 6 J. W. MOORE, FEDERAL PRACTICE ¶ 54.10[2], p. 61 (1966).

13. *See* 6 J. W. MOORE, *supra* Note 12, ¶ 54.10[2], pp. 64–65; Note, 52 CAL.L. REV. 1102 (1964).

14. *See* 20 AM.JUR.2d Courts §§ 111–117 (1965) ; United States v. Dooling, 2 Cir., 406 F.2d 192 (1969).

15. 42 AM.JUR. Prohibition § 5, pp. 140–141 (1942).

16. *See* 7 J. W. MOORE, *supra* Note 12, ¶ 81.07 (1968).

17. Roche v. Evaporated Milk Ass'n, 319 U.S. 21, 26, 63 S.Ct. 938, 87 L.Ed. 1185 (1943).

18. 34 AM.JUR. Mandamus § 9, p. 814 (1941). *See* Note, *supra* Note 13, 52 CAL.L.REV. at 1037, n. 15; 6 J. W. MOORE, *supra* Note 12, ¶ 54.10[2], p. 62 (writs are "correlative").

court with such power.[19]  As noted, it has been a traditional common law power of appellate courts to use the extraordinary writs in aid of their appellate jurisdiction.[20]  In the absence of some specific limitation, we see no reason why the D. C. Court of Appeals is presumed not to have these traditional tools.

Judge Alexander argues that, as a court created by Congress, the D. C. Court of Appeals is a court of limited jurisdiction; further, that limited jurisdiction carries with it a presumption of no jurisdiction in the absence of an express grant.  This is, of course, true.[21]  However, we believe that the limited jurisdiction refers to limits on the subject matter of which the court may take cognizance.  As stated in Note 10, *supra,* we deal here not with an *extension* of the *jurisdiction* of the D. C. Court of Appeals, but simply with the style of relief that court may grant in a case where it has jurisdiction.[22]

■  The appellate jurisdiction of the D. C. Court of Appeals over the Court of General Sessions in criminal matters is uncontested.  Assertion by the D. C. Court of Appeals of the traditional armory of extraordinary writs in aid of

its statutory jurisdiction does not extend that jurisdiction and thus does not offend the concept of limited jurisdiction.[23]

There is a second basis for the D. C. Court of Appeals' use of the prerogative writs: the All Writs Statute, 28 U.S.C. § 1651 (1964).  The All Writs Statute, as revised in 1948, states:

> "The Supreme Court and *all courts established by Act of Congress* may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."

(Emphasis supplied.)  The 1948 revision brought together a variety of statutes, some dating to the original judicial code of 1789, which stated that the federal courts had the power to issue prerogative writs.[24]  The words of Section 1651 literally encompass the D. C. Court of Appeals, a court "established by Act of Congress." [25]  An examination of the text of the 1948 revision of Title 28 of the Judicial Code leads us to conclude that Congress meant just what it said.

Title 28 deals mainly with federal courts, generally those created pursuant to the authority of Article III of the

---

19.  *See* 11 D.C.CODE § 772(a) (1961 ed.), removing the former direct appellate power of the United States Court of Appeals:
"After the effective date of this subchapter, no writs of error or appeals * * * shall be granted by the United States Court of Appeals for the District of Columbia [from the Court of General Sessions] * * *."
This section was eliminated in the 1963 version of the code as being "obsolete." 17 D.C.CODE § 301 (1967) (Revision Notes).

20.  *See* Notes 10–18, *supra,* and accompanying text.  *See also* State ex rel. Gillette v. Niblack, 222 Ind. 290, 53 N.E.2d 542 (1944) ; People ex rel. Earle v. Circuit Court of Cook County, 169 Ill. 201, 48 N.E. 717 (1897).

21.  *See* C. A. WRIGHT, FEDERAL COURTS § 7, p. 14 (1963).

22.  *And see* Note 13, *supra,* and accompanying text: the writs do not confer or

add to jurisdiction; they simply are in aid of a court's established jurisdiction.

23.  It may be that a court created for a special limited purpose could not claim the power to issue these writs.  However, here we deal with a court created as a traditional plenary appellate court.

24.  *See* Reviser's Note to § 1651 for the former statutes.

25.  The court was originally established as the Municipal Court of Appeals for the District of Columbia in 1942.  Pub.L. 512, 77th Cong., 2d Sess., 56 STAT. 194 (1943).  The name was changed to the present name in 1962.  Pub.L. 87–873, 87th Cong., 2d Sess., 76 STAT. 1172 (1963).  The present codification is found at 11 D.C.CODE § 701 *et seq.* (1967) and 17 D.C.CODE § 301 *et seq.* (1967).  The court has kept essentially unchanged the powers originally granted in 1942.

Constitution.[26] The title is divided into numerous chapters. A general definitional section, Section 451, states:

"The term 'court of the United States' includes the Supreme Court of the United States, courts of appeals, district courts constituted by chapter 5 of this title, including the Court of Claims, the Court of Customs and Patent Appeals, the Customs Court and any court created by Act of Congress the judges of which are entitled to hold office during good behavior."

(Supp. IV 1965–1968.) The D. C. Court of Appeals does not come within this definition since it is not specifically listed and since its judges do not hold life tenure.[27]

Throughout its chapters Title 28 usually refers to "courts of the United States."[28] Where a more general term is used in a chapter, such as simply "courts," that term is specifically defined in a definitional section within the chapter.[29]

■ However, the All Writs Statute, Section 1651, contained in Chapter 111, departs from this usage by referring to "all courts established by Act of Congress." Chapter 111 does not contain any definitional section which would limit this term to certain specific courts. Thus it appears that Congress meant something more than "courts of the United States." Since the language in Section 1651 plainly encompasses the D. C. Court of Appeals, we conclude that the All Writs Statute applies to it as well.

This conclusion is strengthened by the fact that no specific section appears in the statute which indicates that the D. C. Court of Appeals was meant to be excluded, and we could find no reference in the legislative history so indicating. Further, there is compelling evidence that the phraseology of Section 1651 was not simply accidental, perhaps used by one set of revisers of Title 28 with intent to include only "courts of the United States." First, the very next section, Section 1652, contains the term "courts of the United States," clearly indicating that the revisers of that part of Title 28 were familiar with that term and used it with discrimination. Section, Chapter 115, Section 1732, regarding the use of documentary evidence, begins "In any court of the United States and in any court established by Act of Congress * * *." By using both in the same section, it is apparent that the revisers deliberately distinguished between the limited term "courts of the United States" and the broader term used in Section 1651: "all courts established by Act of Congress." Thus Section 1651 reaffirms the inherent power of Congress-created courts, including the D. C. Court of Appeals, to issue the extraordinary writs in aid of their given jurisdiction.

Accordingly, we hold that the D. C. Court of Appeals has the power, in appropriate cases, to issue the prerogative writs.

## II

We turn to the question whether this was an appropriate case for issuance of the writs of mandamus and prohibition.[30] Since the D. C. Court of Appeals had the *power* to issue the writs, the question is whether it exercised that power with *sound discretion*. From Ex parte Crane, 30 U.S. (5 Pet.) 190, 8 L.Ed. 92 (1831),

---

26. However, the title includes the United States District Court for the District of Puerto Rico. *See* § 119. That court is regarded as a "legislative," not a "constitutional," court. *See* C. A. WRIGHT, *supra* Note 21, p. 31.

27. The judges are appointed for terms of 10 years. 11 D.C.CODE § 702.

28. *See, e.g.,* 28 U.S.C. §§ 1784, 1915, 2001 (1964).

29. *See, e.g.,* 28 U.S.C. §§ 610, 963 (1964).

30. Judge Alexander also raises the question of the propriety of the *ex parte* temporary restraining order issued by the D.C. Court of Appeals pending its decision. This point is made moot, however, by that decision.

to Will v. United States, 389 U.S. 90, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967), the Supreme Court has on numerous occasions attempted to delineate the concerns which should prompt an appellate court to issue, or to refuse to issue, these writs in aid of their appellate jurisdiction.[31] It can fairly be said, however, that the course the Court has charted over the century and a half has not demonstrated the kind of precision or specificity which would make issuance of the writs a mechanical exercise. Rather than attempt to codify the many considerations into a set of unwieldy rules, we simply set out some of them and then state the considerations in this case which we find made it an appropriate one for mandamus and prohibition.

■ The Supreme Court has stressed the theme that the issuance of the writ is a matter of sound discretion. Will v. United States, supra; Roche v. Evaporated Milk Ass'n, 319 U.S. 21, 63 S.Ct. 938, 87 L.Ed. 1185 (1943). The governing principles are equitable, even though the writ of mandamus technically issues at law. Duncan Townsite Co. v. Lane, 245 U.S. 308, 38 S.Ct. 99, 62 L.Ed. 309 (1917). The appellate court issues the writ in two classic situations: where the lower court has acted without jurisdiction or power, or where the lower court has clearly abused its discretion.[32]

■ The writs are extraordinary remedies which are not to become mere substitutes for appeal. Will v. United States, supra; United States Alkali Export Ass'n v. United States, 325 U.S. 196, 65 S.Ct. 1120, 89 L.Ed. 1554 (1945); Ex parte Chicago, Rock Island & Pacific Ry. Co., 255 U.S. 273, 41 S.Ct. 288, 65 L.Ed. 631 (1921). However, the writs can be issued where an appeal would ultimately lie, United States Alkali Export Ass'n v. United States, supra, as well as where the action of the lower court would frustrate the appeal, McClellan v. Carland, 217 U.S. 268, 30 S.Ct. 501, 54 L.Ed. 762 (1910), or would diminish the appellate jurisdiction already obtained, United States v. Mayer, 235 U.S. 55, 35 S.Ct. 16, 59 L.Ed. 129 (1914). Among the factors to be considered are whether the matter is of "public importance," Ex parte Republic of Peru, 318 U.S. 578, 63 S.Ct. 793, 87 L.Ed. 1014 (1943); whether the policy against piecemeal appeals would be frustrated, Roche v. Evaporated Milk Ass'n, supra; whether there has been a willful disregard of legislative policy, United States Alkali Export Ass'n v. United States, supra, or of the rules of a higher court, Will v. United States, supra; and wheth-

31. Some of the major cases along the way are: Ex parte Bradley, 74 U.S. (7 Wall.) 364, 19 L.Ed. 214 (1868); McClellan v. Carland, 217 U.S. 268, 30 S.Ct. 501, 54 L.Ed. 762 (1910); United States v. Mayer, 235 U.S. 55, 35 S.Ct. 16, 59 L.Ed. 129 (1914); Duncan Townsite Co. v. Lane, 245 U.S. 308, 38 S.Ct. 99, 62 L.Ed. 309 (1917); Ex parte Chicago, Rock Island & Pacific Ry. Co., 255 U.S. 273, 41 S.Ct. 288, 65 L.Ed. 631 (1921); Los Angeles Brush Mfg. Corp. v. James, 272 U.S. 701, 47 S.Ct. 286, 71 L.Ed. 481 (1927); Ex parte United States, 287 U.S. 241, 53 S.Ct. 129, 77 L.Ed. 283 (1932); Ex parte La Prade, 289 U.S. 444, 53 S.Ct. 682, 77 L.Ed. 1311 (1933); Ex parte Republic of Peru, 318 U.S. 578, 63 S.Ct. 793, 87 L.Ed. 1014 (1943); Roche v. Evaporated Milk Ass'n, supra Note 17; United States Alkali Export Ass'n v. United States, 325 U.S. 196, 65 S.Ct. 1120, 89 L.Ed. 1554 (1945); Ex parte Fahey, 332 U.S. 258, 67 S.Ct. 1558, 91 L.Ed. 2041 (1947); La Buy v. Howes Leather Co., 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957); Fong Foo v. United States, 369 U.S. 141, 82 S.Ct. 671, 7 L.Ed.2d 629 (1962); and Schlagenhauf v. Holder, 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964).

32. La Buy v. Howes Leather Co., supra Note 31, 352 U.S. at 257, 77 S.Ct. 309 ("clear abuse of discretion"); Roche v. Evaporated Milk Ass'n, supra Note 17, 319 U.S. at 32, 63 S.Ct. at 945 ("to compel an inferior court to relinquish a jurisdiction which it could not lawfully exercise or to exercise a jurisdiction which it had unlawfully repudiated"); Los Angeles Brush Mfg. Corp. v. James, supra Note 31, 272 U.S. at 705, 47 S.Ct. 286 (abuse of discretion or no jurisdiction); United States v. Mayer, supra Note 31, 235 U.S. at 70, 35 S.Ct. 16 (beyond the "power" of the lower court); Ex parte Bradley, supra Note 31.

er refusal to issue the writ may work a serious hardship on the parties, United States Alkali Export Ass'n v. United States, *supra*. The clearer the lower court's lack of jurisdiction the more appropriate will be the writs' issuance, Ex parte Chicago, Rock Island & Pacific Ry. Co., *supra*, but the writs will issue where the question of jurisdiction is undecided, Schlagenhauf v. Holder, 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964).

██ In this case the writs were appropriately requested by the prosecution for several reasons. The District government's challenge was entirely to the jurisdiction of the Court of General Sessions to issue any orders of this type; the District government did not merely question the scope of the order. This type of order was unprecedented. There was a legitimate uncertainty on the part of the District government, because of the novelty of the order, whether the order was appealable at all. In any event, there was a need for a speedy determination of the question, both because the issuance of the Duncan Report and the accompanying action of the Commissioners made the issue a timely one, and because the judge was contemplating similar action in other cases. Finally, the hearing on compliance appeared to be a wide-ranging inquiry into the Police Department's practices; the District government had a legitimate interest in preventing this type of inquiry if, as it felt, the court had no jurisdiction to entertain it in the first place. Thus the novelty of the issues, the prime question of jurisdiction, the public importance and timeliness of the judge's order, and the hard-

ship to the District government made this case appropriate for the extraordinary writs.[33]

### III

It is conceded that the Court of General Sessions, Criminal Division, would have no original jurisdiction to prohibit dissemination of arrest records. The D. C. Court of Appeals held further, however, that the Criminal Division of the Court of General Sessions

"has no ancillary jurisdiction, equitable or otherwise, after disposing of a criminal proceeding, to issue orders respecting the arrest record of a discharged defendant."[34]

Subsumed within this issue are three questions: (1) whether the Court of General Sessions has any ancillary jurisdiction whatever; (2) if it does, what the limits of that jurisdiction are; and (3) whether orders prohibiting dissemination of arrest records are within those limits.

██ A. The position of the District government below and the decision of the D. C. Court of Appeals could be taken as an assertion that the Court of General Sessions lacks any ancillary jurisdiction at all.[35] This is incorrect, for all courts, absent some specific statutory denial of power, possess ancillary powers to effectuate their jurisdiction:

"* * * [E]very regularly constituted court has power to do all things that are reasonably necessary for the administration of justice within the scope of its jurisdiction, and for the enforcement of its judgments and mandates. So demands, matters, or questions ancillary or incidental to, or

33. In Part III, *infra*, we hold that the Court of General Sessions has jurisdiction to issue orders regarding dissemination of arrest records. Thus in the future the only question will be the appropriate scope of such an order in each particular case. The D.C. Court of Appeals has appellate jurisdiction over final orders of the Court of General Sessions, 11 D.C. CODE § 741; orders prohibiting dissemination of arrest records, placing an immediate restraint on public officials, are final and thus appealable. Therefore, in

the future mandamus and prohibition would be inappropriate means of challenging the scope of such an order.

34. In the Matter of Alexander, 243 A.2d 901, 904 (1968).

35. The court's opinion stated at one point: "[W]e know of no equitable jurisdiction possessed by the criminal division of the court ancillary to its jurisdiction over criminal offenses * * *." 243 A.2d at 904.

growing out of, the main action * * may be taken cognizance of by the court and determined, since such jurisdiction is in aid of its authority over the principal matter, even though the court may thus be called on to consider and decide matters which, as original causes of action, would not be within its cognizance. * * * "[36]

Ancillary jurisdiction has been referred to as "a common sense solution" of the problems courts, especially courts of limited jurisdiction, face in attempting to "do complete justice in the premises."[37] If no such powers existed, parties would be forced to go to different courts to obtain complete relief. The notion that a party must go to several forums to obtain relief in any given situation, deriving from the ancient and formalistic distinctions between law and equity, has been discredited. The important policy of having one single expeditious resolu-

tion of a dispute has thus led to the doctrine of ancillary jurisdiction and analogous practices of courts.[38]

The District government here appears not to be pressing the argument that the Court of General Sessions has no ancillary powers at all; rather, it concedes that it can take action in a criminal matter going beyond the determination of guilt or innocence and sentencing. The District refers to the power of the Court of General Sessions to issue orders in matters which are "incidents of the criminal litigation."[39] It refers to such matters as calling up prisoners, protecting defendants, returning property seized from a defendant found innocent, and returning collateral posted prior to trial. These, it concedes, are within the jurisdiction of the Court of General Sessions.[40] It does not seem fruitful to debate whether these matters are somehow integral parts of the original criminal

---

36. 21 C.J.S. Courts § 88, pp. 136–138 (1940). (Footnotes omitted.) Ancillary jurisdiction has found its greatest use in the federal courts because of the concept of limited jurisdiction:
"Ancillary jurisdiction exists because without it the court could neither effectively dispose of the principal case nor do complete justice in the premises. It is a common-sense solution of the problems of piecemeal litigation which otherwise would arise by virtue of the limited jurisdiction of federal courts."
1 W. BARRON & A. HOLTZOFF, *supra* Note 10, § 23, p. 94. (Footnotes omitted.)

37. *Ibid.*

38. One such practice, an extension of the notion of ancillary jurisdiction, is the concept of "pendent jurisdiction" in the federal courts. By this doctrine, when a party lists federal and non-federal grounds for a cause of action, the federal court has jurisdiction of the entire case, including the non-federal ground, regardless of the outcome of the federal ground. United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ; Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933) ; 28 U.S.C. § 1338 (1964).
The policy of one dispute—one forum lies behind two decisions of this court in which we held that the Court of General Sessions, not the United States District

Court, is the proper forum for suit to enforce or augment decrees or agreements in domestic relations matters originally brought in the Court of General Sessions. Den v. Den, 126 U.S.App.D.C. 152, 375 F.2d 328 (1967) ; David v. Blumenthal, 110 U.S.App.D.C. 272, 292 F.2d 765 (1961). Thus in *Den* we pointed out that our decision avoided a situation where the plaintiff "would wind up litigating in two separate forums over what in essence is a unitary problem." 126 U.S.App.D.C. at 154, 375 F.2d at 330. And in *David* we said:
" * * * [I]t would be highly burdensome to both courts so to split the cause of action into segments, since both would be handicapped * * * by lack of authority to deal with the problem in all its aspects."
110 U.S.App.D.C. at 275, 292 F.2d at 768. *See also* Encyclopaedia Britannica v. Jones, D.D.C., 101 F.Supp. 521 (1951) (judgment secured in D.C. Municipal Court should be enforced there; not in U.S. District Court) ; Paley v. Solomon, D.D.C., 59 F.Supp. 887 (1945).

39. Brief for the District of Columbia, p. 15.

40. In a footnote to its decision, the D.C. Court of Appeals also referred to, and approved, the power of the Court of General Sessions to deal with such matters. 243 A.2d at 904 n. 10.

matter or are, to some degree, ancillary thereto. Rather, we take the District's position to be acquiescence in the general principle just described—that courts, including the Court of General Sessions, have power to act with regard to matters ancillary to an original matter—and we turn to the issue of what the contours of this ancillary jurisdiction are.

■ B. In determining the limits of the ancillary jurisdiction of the Court of General Sessions in criminal matters, we begin by rejecting any argument that ancillary jurisdiction somehow turns on whether the court has or does not have original equity powers. The District in its brief suggests that the issue is whether the Court of General Sessions has "equitable" ancillary jurisdiction, arguing that it does not because it is not a court of equity. However, in other places in its brief, and in the opinion of the D. C. Court of Appeals, this argument is not pressed; thus the D. C. Court of Appeals held that the Court of General Sessions has no ancillary jurisdiction, "equitable *or otherwise*," to issue the order regarding the arrest record. (Emphasis added.) Further, the situations approved by the District and the D. C. Court of Appeals where, for example, the Court of General Sessions orders property returned, enjoins someone from interfering with witnesses, sequesters witnesses or orders collateral returned would appear to be non-criminal matters, to some degree equitable in nature. In any event, the distinction between law and equity is not the crux of the matter; rather, the issue is what ancillary actions a court appropriately may take in aid of its original jurisdiction. The answer to this turns on the relationship between the original matter and the ancillary order, not the label ("equitable," "legal" or other) which is attached to that order.

We could find no clear or systematic limitations on, or definitions of, ancillary jurisdiction. Ancillary jurisdiction arises in several contexts, and, as the First Circuit stated in Walmac Company v. Isaacs, 220 F.2d 108, 113–114 (1955):

" * * * At least so far as we are aware no court has ever tried to fix its limits with any degree of precision. It springs from the equitable doctrine that a court with jurisdiction of a case may consider therein subject matter over which it would have no independent jurisdiction whenever such matter must be considered in order to do full justice. * * * "

Perhaps the most common context is when a party asks a court which has rendered judgment in its favor to issue a further order to force the opposing party to carry out the terms of the original judgment. *See, e. g.*, Dugas v. American Surety Co., 300 U.S. 414, 428, 57 S.Ct. 515, 81 L.Ed. 720 (1937); Supreme Tribe of Ben-Hur v. Cauble, 255 U.S. 356, 367, 41 S.Ct. 338, 65 L.Ed. 673 (1921); Root v. Woolworth, 150 U.S. 401, 410–413, 14 S.Ct. 136, 37 L.Ed. 1123 (1893). Similarly, a court in a bankruptcy case can issue ancillary orders "in aid of and to effectuate the adjudication and order made by the same court," in order to "secure or preserve the fruits and advantages of a judgment or decree." Local Loan Co. v. Hunt, 292 U.S. 234, 239, 54 S.Ct. 695, 697, 78 L.Ed. 1230 (1934). In this context, the court will be careful to prevent a party from "obtain[ing] by stealthy appropriation what the court had held it could not have by judicial compulsion." Moore v. New York Cotton Exchange, 270 U.S. 593, 610, 46 S.Ct. 367, 371, 70 L.Ed. 750 (1926).

Another context in which ancillary powers have been used is in the supervision of the publicity attendant on a criminal trial. Thus in Sheppard v. Maxwell, 384 U.S. 333, 359–362, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), the Supreme Court noted that the trial judge should have used a wide range of powers to curb witnesses and counsel from making statements to the press. The Court merely noted that such action was "concededly within the court's power," *id.* at 361, 86 S.Ct. 1507; there was no discussion of the range of ancillary actions open to a criminal court.

■ Ancillary matters have been broadly defined as matters "auxiliary, accessorial or subordinate" to the main matter. Glens Falls Indemnity Co. v. United States, 9 Cir., 229 F.2d 370, 373–374 (1956). The overriding concern of the courts has been to insure that *"complete* justice may be done." State of Iowa v. Union Asphalt & Roadoils, Inc., S.D.Iowa, 281 F.Supp. 391, 396 (1968). (Emphasis in original.) The *Union Asphalt* case involved a petition for payment of attorney fees. The court, in ordering the fees to be paid, stated:

" * * * The ancillary jurisdiction theory is relatively simple—once federal jurisdiction properly attaches to a primary case, the court also has jurisdiction over certain subsidiary or subordinate disputes even though it might not independently be able to proceed to adjudicate them. * * * It is well-settled that upon substitution of attorneys in litigation, a client may be required to * * * pay the attorney * * *. * * * The precepts of the ancillary jurisdiction doctrine dictate that the federal courts should extend their jurisdiction to encompass orbital disputes subordinate to the principal action * * *. * * * "

281 F.Supp. at 396.

Although the theory of ancillary jurisdiction may be "relatively simple," it is apparent that it is not a theory easily quantified. The major purpose of ancillary jurisdiction, as seen from the cases cited above, is to insure that a judgment of a court is given full effect; ancillary orders will issue when a party's actions, either directly or indirectly, threaten to compromise the effect of the court's judgment. This purpose is joined by another, mentioned in Section A, *supra,* that of judicial economy; disputes related to a single dispute should be resolved

in the original forum. Den v. Den, 126 U.S.App.D.C. 152, 375 F.2d 328 (1967); David v. Blumenthal, 110 U.S.App.D.C. 272, 292 F.2d 765 (1961).

■ To effectuate these purposes, and yet confine a court to proper bounds consistent with the past use of ancillary jurisdiction as discussed above, we believe that, in a situation such as the one before us, ancillary jurisdiction should attach where: ᵃ (1) the ancillary matter arises from the same transaction which was the basis of the main proceeding, or arises during the course of the main matter, or is an integral part of the main matter; (2) the ancillary matter can be determined without a substantial new fact-finding proceeding; (3) determination of the ancillary matter through an ancillary order would not deprive a party of a substantial procedural or substantive right; and (4) the ancillary matter must be settled to protect the integrity of the main proceeding or to insure that the disposition in the main proceeding will not be frustrated.

■ C. Applying this approach to the matter in hand, we find that the Court of General Sessions here had the power to issue an order regarding the dissemination of Morrow's arrest record. The arrest was an integral part of the criminal proceeding. The order prohibiting dissemination of the arrest record did not require an independent fact-finding process.[41] The order did not deprive the District government of a procedural right, such as trial by jury.[42]

The next determination is whether the order deprived the District of a substantive right—the right to keep and use as it sees fit its police records. The parties have devoted much discussion to the cases which hold that arrest records can or cannot be ordered expunged or be

41. The hearing on compliance involved extended fact-finding, but this is separate from the issuance of the order in the first place.

42. This distinguishes the hypothetical put forward by the District as indistinguish-able from the case in hand—an order finding the police liable for false arrest or the prosecution liable for malicious prosecution. Such an order could only come after a full trial; it could not be entered as an ancillary order.

enjoined from distribution.[43] Some courts have held that there is an important police function served by dissemination of these records, at least to other law enforcement agencies.[44] Others have held that in particular cases either the state has no legitimate interest in maintaining the records or that any interest is outweighed by the defendant's interests.[45]

However, we need not resolve these factors in any refined way. It is apparent from the Duncan Report, the testimony at the compliance hearing, and even from statements in the District's brief,[46] that in the District of Columbia restraints may be put on dissemination of arrest records in cases which do not result in convictions or forfeiture of collateral. We do not decide what the proper scope of such restrictions should be; the D. C. Court of Appeals will make that determination, weighing the factors and cases cited by the parties here. It is clear, however, that the government of the District of Columbia has no absolute right to do what it wishes with police arrest records.

Finally, in view of the extensive documentation of the harm which comes from dissemination of arrest records, to employers at least, including the likelihood that employers cannot or will not distinguish between arrests resulting in convictions and arrests which do not,[47] an order regarding dissemination of arrest records in a case dismissed by the court is reasonably necessary to give complete effect to the court's order of dismissal. Accordingly, we hold that the Court of General Sessions does have the power to issue an order regarding the arrest record in a criminal case which has been before the court.

## IV

Our holding is limited. We do not decide whether the order in this case was appropriate or proper in scope; it is for the D. C. Court of Appeals to make that determination on the remand. However, we think it is apropriate to discuss, without drawing conclusions, some of the considerations regarding dissemination of arrest records, both for the guidance of the D. C. Court of Appeals and for clarification of the underlying issue which triggered the various proceedings in this case.

Congress has required the keeping of two sets of police records relating to arrests. One set is the collection of arrest books, authorized by 4 D.C.CODE § 134(4) (1967); these are presently kept at each precinct, encompassing merely a chronological record of each arrest. A second set of records is required by 4 D.C.CODE § 134a (1967); these are the "central criminal records," consisting of a fuller record of the progress of the prosecution based on the arrest. They are presently collected in central police files, arranged alphabetically. There is a card for each person arrested in the District; on the card all arrests of that person are recorded with the disposition of each. By statute, 4 D.C.CODE § 135 (1967), only the former set of records (arrest books) is required to be "open to public inspection."

As a practical matter, it is only the central criminal files which are at issue here; it would be virtually impossible to check on the arrest record of a person by using the precinct arrest books because one would have to know the approximate date and place of each arrest. The requirement that arrest books be open to the public is to prevent any

---

43. *See* Annot., 83 A.L.R. 127 (1933) ; 21 AM.JUR.2d Criminal Law § 369 (1965) ; 6 C.J.S. Arrest § 17c(2) (1937).

44. *See* Herschel v. Dyra, 7 Cir., 365 F.2d 17, cert. denied, 385 U.S. 973, 87 S.Ct. 513, 17 L.Ed.2d 436 (1966) ; Kolb v. O'Connor, 14 Ill.App.2d 81, 142 N.E.2d 818 (1957).

45. *See* United States v. McLeod, 5 Cir., 385 F.2d 734 (1967) ; United States v. Kalish, D.P.R., 271 F.Supp. 968 (1967).

46. *See* Brief for the District of Columbia, p. 21. *See generally,* Part IV, *infra.*

47. *See* Part IV, *infra.*

"secret arrests," a concept odious to a democratic society [48]; in view of the statutory requirement that such records be public, any attempt to prohibit public inspection of the arrest books would run into substantial legal difficulties.

In 1954 the Corporation Counsel, prior to the enactment of the above mentioned sections of the District of Columbia Code, issued a ruling stating that police records could not be made public because to do so would violate a person's right of privacy. In 1956, after the sections of the code were enacted, the Corporation Counsel reversed himself, stating that all records, including the central criminal files which are *not* required to be public, could be disseminated to interested persons. In 1963 the Corporation Counsel delineated the scope of "interested persons" as "Detective Agencies, Credit Associations and the like." [49]

This new policy ushered in an era of hard times for job applicants in the District. The Duncan Report noted that the entire central arrest record was reproduced and furnished without cost to government agencies and to the person arrested. The Report found further that "institutional and other non-governmental employers in the District of Columbia area routinely require job applicants to obtain and provide copies of their arrest records * * *." [50] It was brought out at the compliance hearing in this case that a select group of about 50 private companies is furnished arrest records routinely upon request.[51] A total of more than *3,500* records was disseminated *a week* at the time the Duncan Committee studied the problem.[52]

The arrest records, the Duncan Report found, are often difficult to understand; thus it may be hard for an untrained person to discern that several notations really relate to just one arrest, or that an arrest did not result in a prosecution.

The Report then detailed the enormous influence dissemination of these records has on a person's job opportunity. It noted that some groups "calculated that between 60% and 90% of the male working population in some predominantly Negro areas of the District of Columbia is systematically excluded from between 25% and 50% of the jobs available to them in relation to their skills." [53] There was a similarly disastrous effect on a person's chances for government employment, and even for getting some city licenses and permits. The Report noted the irony of this practice at a time when government was declaring an all-out effort to employ the underprivileged, a group with a high incidence of arrest.

The Report's recommendations, as adopted by the Board of Commissioners, are set out in the appendix. The major points relevant here are that arrest records cannot be furnished to employers unless the record is recopied to include only those arrests resulting in convictions or forfeitures of collateral; complete and unexpurgated arrest records can, however, be disseminated to other law enforcement agencies.

The main evil produced by dissemination of arrest records thus seems to be the adverse effect on job opportunity. To this extent, it appears that the Duncan Report rules would be a good rule of thumb as to the appropriate scope of a court order prohibiting dissemination of arrest records. However, other evils, such as unjustified invasion of privacy, particularly where innocent persons are arrested, may result from such dissemination in particular cases, indicating the possible need for a flexible rather than a fixed rule.

The Corporation Counsel's argument that a person somehow lost his right of privacy in records pertaining to his arrest when Congress enacted 4 D.C.Code

48. H.R.Rep.No.2332, 83rd Cong., 2d Sess. (1954).

49. Duncan Report, p. 5.

50. *Id.* at p. 6.

51. Apparently the Duncan Committee was not aware of this practice. The origins of the practice seem obscure.

52. Duncan Report, p. 20.

53. *Id.* at p. 7.

§§ 134(4), 134a and 135 seems open to question. Congress provided only that the precinct arrest books be kept public; the difficulty in tracing a person's arrest history from these books has been noted, and thus the arrest books are more likely to serve only the purpose of protecting against secret arrests. The inquiry might better be directed to the question: what valid law enforcement purposes are served by retaining and disseminating to law enforcement agencies the arrest record in a particular case? Thus the focus would include the reasons for the dismissal or other disposition of the case (if dismissed on a technicality there might be better reason to keep the records intact than if dismissed for lack of evidence; further in the rare case of a malicious prosecution there seems no valid reason for maintaining the record).[54] Another focus of the inquiry would be the nature of the crime; some types of crimes may follow a pattern, in which case it would be more reasonable to retain a record of who has been repeatedly arrested in a certain area for such a crime.

The Duncan Report rules, even if adopted by the court as a guide, could not be applied mechanically. They leave much room for interpretation. Dissemination is allowed to "law enforcement agents" for "law enforcement purposes." It may be appropriate in a particular case for a judge to set limiting definitions to those phrases—for example, a situation where a defendant could show that a law enforcement agent was intending to divulge the arrest record to a state legislative committee conducting a general investigation.

In sum, the D. C. Court of Appeals will have before it the issues of what rec-

ords can be disseminated and to whom, whether in particular types of cases physical expungement is necessary, or whether no order is required. Should the court adopt a flexible individual case approach, the record in Morrow's case seems sufficiently complete to make a determination whether the interests of law enforcement indicate that the order should be restricted to the Duncan Report rules or to some other limitations.

## V

Two further issues bear brief comment: (1) whether an order prohibiting dissemination of police records can run against the Police Department; and (2) when a hearing on compliance with such an order is appropriate. As to the first, the D. C. Court of Appeals stated that Judge Alexander's order was invalid because it prohibited the Police Department from disseminating arrest records although only the Corporation Counsel was present and taking part in the prosecution. This position is incorrect. The prosecution was by the District of Columbia government. Although it may be true that in a criminal case brought by the District not every branch or agency of the District of Columbia government is before the court for all purposes, certainly any agency of that government, if given notice of an order, can be bound where its duties are relevant to the subject matter of the order.

The District of Columbia is a municipal corporation, 1 D.C.Code § 102 (1967), and it is black-letter law that injunctions against a corporation can bind officers, agents and employees of that corporation who have notice of the order. 7 J. W. MOORE, FEDERAL PRACTICE ¶ 65.13 (1968) ; 3 W. BARRON & A. HOLT-

---

54. *See* United States v. McLeod, *supra* Note 45, where the sheriff of Dallas County at Selma, Alabama, was found to have instituted arrests of civil rights demonstrators in order to harass them. The court held:

"* * * The Court can and must, however, do all within its power to eradicate the effect of the unlawful prosecu-

tions in this case. We therefore hold that the district court should enter an order requiring the appropriate officials of Dallas County to return all fines, and to expunge from the record all arrests and convictions resulting from the prosecutions which form the basis for these suits. * * *"

385 F.2d at 750.

ZOFF, FEDERAL PRACTICE AND PROCEDURE § 1437 (Wright ed. 1958). The police agents of the District arrested this defendant, the District's Corporation Counsel prosecuted the defendant in the name of the District, and the court could properly issue orders against the District regarding the record of the defendant's arrest; the court's order, to be effective, could properly run against the District's Police Department which was given notice of the order.[55]

Regarding the second point, there are aspects of the hearing on compliance which make this court uneasy. Judge Alexander scheduled the hearing on compliance and issued a subpoena to the police official in charge of the arrest records. That official brought with him, under the subpoena's demand, reams of records regarding the practice of disseminating arrest records. The hearing began at 6:00 P.M. and went until 10:30 P.M., at which point it was recessed. The police official was questioned at length—often more strenuously by the judge than by counsel for the defendant —about many aspects of the general practice of dissemination of arrest records; the questioning did not seem particularly focused on Morrow's arrest record.

There should be a proper reluctance to force government officials to go through a searching inquiry into the practices of their departments; unless a clear need for such an inquiry is shown, it is best avoided. We hold today that judges of the Court of General Sessions have the power to issue orders prohibiting dissemination of arrest records. If such an order is issued and the District government contests its scope, or contests its appropriateness at all in a particular case, it can appeal that order to the D. C. Court of Appeals. In the meantime it is presumed to be complying with the order. If the defendant questions this compliance, he can petition the court for an order to show cause and ultimately a hearing on compliance. The court should first request from the District government a statement of whether that government is complying; if the response is in the affirmative, the presumption of the correctness of government ministerial action should require that the defendant make some showing to the contrary before a hearing is commenced. And if a hearing is appropriate, it should be limited as narrowly as possible to the specific issue of compliance with the particular order.

In this case we note that Judge Alexander did ask the Assistant Corporation Counsel prior to the hearing, "[C]an you affirm [whether the District government] has or has not * * * complied with [the order]?" To which counsel replied, "No, sir, I am not in a position to do that." Given this position, a hearing may have been appropriate. However, the Corporation Counsel's response may well have been a result of the conflicting pressures and positions the District government was taking *vis-à-vis* the jurisdiction of the court to issue the order in the first place.

The D. C. Court of Appeals stayed the hearing. It will continue to be stayed until after the D. C. Court of Appeals' decision on remand on the proper scope of the order. At that time it is open to the defendant to request another showing of compliance by the District government; however, the hearing itself should not be reinstituted until the District has had a chance to state whether it is in compliance, and until the defendant has made some showing that the District has not been complying if it states that it has. Further, if the hearing does recommence, the scope of the questioning should be restricted to the record in

55. Similarly, orders regarding arrest records could extend to the Police Department in a case where the police made an arrest and the United States Attorney brought the prosecution in the Court of General Sessions. In such a case the police would be acting as agents of the United States under their command from Congress to enforce "all laws and ordinances in force in the District." 4 D.C. CODE § 119 Tenth (1967).

Morrow's case plus only that additional evidence needed to resolve the fate of his particular arrest record.

Reversed and remanded to the District of Columbia Court of Appeals.

## APPENDIX

Walter N. Tobriner
President
Board of Commissioners, D. C.

Charles T. Duncan        November 2, 1967
Corporation Counsel, D. C.

Revisions and Adoption by the Board of Commissioners of Recommendations of the Committee to Investigate the Effect of Police Arrest Records on Employment Opportunities in the District of Columbia

At the Board meeting on October 31, 1967, the recommendations of the Arrest Records Committee were adopted, subject to certain modifications. The recommendations, as revised and approved by the Board, are as follows:

1. That no record, copy, extract, compilation or statement concerning any record relating to any juvenile offender or relating to any juvenile with respect to whom the Metropolitan Police Department retains any record or writing, shall be released to any person for any purpose except as may be provided under D.C.Code, Section 11–1586; provided, that the release of such information to members of the Metropolitan Police Department, and the dissemination of such information by the Metropolitan Police Department to the police departments of other jurisdictions wherein juveniles apprehended in the District of Columbia may reside, shall be authorized; provided further, that the release of such information to individuals to whom the information may relate or to the parents or guardians or duly authorized attorneys of such individuals, shall be authorized in those cases in which applicants therefor present documents of apparent authenticity indicating need for such information for reasons other than employment. The term "employment", in the context of this paragraph, shall not include military service.

2. That unexpurgated adult arrest records, as provided under D.C. Code, Section 4–134a, shall be released to law enforcement agents upon request, without cost and without the authorization of the persons to whom such records relate and without any other prerequisite, provided that such law enforcement agents represent that such records are to be used for law enforcement purposes. The term "law enforcement agent" is limited in this context to persons having cognizance of criminal investigations or of criminal proceedings directly involving the individuals to whom the requested records relate. The term includes judges, prosecutors, defense attorneys (with respect to the records of their client defendants), police officers, Federal agents having the power of arrest, clerks of courts, penal and probation officers and the like. It does not include private detectives and investigators; personnel investigators, directors and officers; private security agents or others who do not ordinarily participate in the process involving the detection, apprehension, trial or punishment of criminal offenders.

3. That, subject to the foregoing, adult arrest records, as provided under D.C.Code, Section 4–134a, shall be released in a form which reveals only entries relating to offenses which have resulted in convictions or forfeitures of collateral.

4. That, subject to the foregoing, adult arrest records, as provided under D.C.Code, Section 4–134a, shall be released in a form which reveals only entries relating to offenses committed not more than 10

years prior to the date upon which such records are requested; except that, where an offender has been imprisoned during all or part of the preceding 10-year period, the record shall include entries relating to such earlier conviction.

5. That, subject to the foregoing, copies or extracts of adult arrest records, as provided under D.C. Code, Section 4–134a, or statements of the non-existence of such records shall be released to applicants therefor upon the payment of fees to be based upon the cost of editing and producing such copies, extracts or statements; provided, that applicants who are not the persons to whom such records may relate must, in addition to the required fees, present releases in appropriate form executed by the persons to whom the records may relate; provided further, that no fee shall be required with respect to any record solicited by any agent of the Federal or District of Columbia Government for a governmental purpose.

6. That Article 47 of the Police Regulations of the District of Columbia be amended to provide that it shall be an offense punishable by a fine not to exceed $50.00, for any person to require as a condition of employment the production of any arrest record or copy, extract or statement thereof at the expense of any employee or applicant for employment to whom such record may relate.

The foregoing revised and approved recommendations will become effective 90 days after October 31, 1967. In the interim the Metropolitan Police Department is requested to establish and submit the fee (based on cost) which will be charged for arrest record information. The Department is also requested to submit a proposed form on which such information will be transmitted to applicants.
C–C
CTDUNCAN+THJOHNSON/ahm
11–02–67
cc: C–C Office File

TAMM, Circuit Judge, concurring in part and dissenting in part:

While I agree in the result reached by the majority in its treatment of the law in parts I, II, and IIIA of its opinion, I cannot assent to the imprecise handling of the law in the remainder thereof and therefore note my disapproval.

Today's holding gives to any judge, in any court, at any time, the power to issue an order regarding the dissemination of an arrest record of a defendant who, for whatever reason, has his case dismissed. It is my view that such a grant of power in this case neither conforms to the applicable law nor adheres to a sound approach to criminal justice.

The majority, in treating the case law in this area in footnote fashion,[1] lays down valuable precedent for the propositions that: (1) determinations regarding arrest records of defendants are ancillary to a criminal court's principal jurisdiction of determining guilt or innocence of a particular individual; (2) orders will issue requiring certain agencies charged with maintaining criminal records not to disseminate those records where the criminal proceeding *terminated* in favor of that individual; and (3) these agencies, through representation by the city attorney, are *before* the court for jurisdictional purposes even though not before the court as a named party. The precedential value of these holdings is readily apparent and footnote citations of authority coupled with seven or eight pages of policy discussion hardly seem adequate to fortify so far-reaching a decision.

The court, apparently striving to achieve a legal first in treating the significant legal question of whether de-

---

1. *See* majority opinion notes 44 and 45.

terminations with respect to an arrest record are ancillary to a criminal proceeding, outlines four standards it utilizes in resolving that question, and each of which, I suppose, must be met before ancillary jurisdiction attaches. They say that a matter is ancillary where it arises from, forms the basis for, or is an integral part of the main proceeding and to this extent, I agree. An arrest record clearly forms the basis out of which prosecution thereon arises. Beyond this point I cannot go for the court then proceeds to say that a matter is ancillary where its resolution can be determined without a new and substantial fact-finding proceeding. If this be so, then it is my position that an order barring distribution of an arrest record cannot be ancillary to the main proceeding because it could not be entered without a new and substantial fact-finding proceeding by the court. This is so because when a court sits in law to determine guilt or innocence of a party, it reviews certain facts relative to proof of the elements of a crime and its jurisdiction extends only to the making of that determination fairly. However, when the question of dissemination of the accused's arrest record is undertaken, the court sits "in equity," so to speak, and a whole new fact-finding proceeding begins. Questions must be answered such as: who keeps the records, where, and for how long? How is the record kept? Who has access to the record and who is notified of the arrest? Who, if anyone, may obtain copies, what do they look like, and do they accurately portray the disposition? Was there probable cause for the arrest or was it maliciously prosecuted? What are the police needs for the records? Do these needs bear a rational connection to the needs of society in criminal detection and prevention? These and other questions[2] must be looked into by the court so as to fairly

decide these issues, and to say that these questions are neither new nor substantial with respect to the main proceeding is an ingenious approach to what "fact-finding" actually entails.

The court goes on to say that a matter is ancillary where the order would not operate to deprive a party of a substantial procedural or substantive right. If this also is true then the order in question cannot be ancillary for a party to that proceeding is the public trust which, by statute, has an important substantive right in maintaining records of arrests and in using them consistent with the promotion of public safety and welfare. When an order is entered in derogation of that use, without a full fact-finding hearing, the public is deprived of due process of law. Finally, the majority holds that a matter will be ancillary where its resolution must be effected to protect the integrity of the main proceeding or its disposition, without such resolution, would be frustrated. If this, too, is true then I cannot see how dissemination of an arrest record with the disposition thereof properly noted could serve either to frustrate the disposition of the main proceeding or to penetrate its integrity. The fact remains, regardless of the ultimate outcome, that the defendant was arrested.

"In the absence of statutory direction * * * the power to maintain * * * a city police system carries with it the right * * * to exercise reasonable discretion in such maintenance * * *. Courts should be cautious about interference * * *." State ex rel. Mavity v. Tyndall, 224 Ind. 364, 366, 66 N.E.2d 755, 757 (1946). As the majority notes, few courts have sought to interfere and then, only when the arrest was a form of harassment of Negroes seeking to exercise their voting rights,[3] or where the attempt to keep the arrest record of an individual amounted to a form of spite.[4]

---

2. It took some 80 pages of questions and answers before the D.C. Court of General Sessions began to get the Police Department procedures in proper perspective!

3. United States v. McLeod, 385 F.2d 734 (5th Cir. 1967).

4. United States v. Kalish, 271 F.Supp. 968 (D.P.R.1967).

748

Courts have traditionally restrained themselves from entering this area on the theory that "it is the daily practice of police officers and detectives of crime to use [arrest records] for the discovery and identification of criminals, and that, without such means many criminals would escape detection. * * * It is one of the usual means employed in the police service of the country, and it would be a matter of regret to have its use unduly restricted upon any fanciful theory. * * * " Shaffer v. United States, 24 App.D.C. 417, 426 (1904). In 1909 a Maryland court followed the reasoning of *Shaffer* and noted that the "populous communities which now exist, and the modern facilities for swift and frequent communications and rapid transit, afford hitherto unknown facilities for evading arrest or fleeing from justice, which should be offset in the public interest by providing the agencies, charged with the duty of preserving the public peace and arresting persons reasonably suspected of the commission of crimes, with the most efficient means of detecting and identifying them * * *." Downs v. Swann, 111 Md. 53, 55, 73 A. 653, 655, 23 L.R.A.,N.S., 739 (1909). Was that statement any less pertinent sixty years ago than it is today when a man might fall from an assassin's bullet in Memphis, and his killer thereafter be apprehended in London?

The court here leaves the impression that it also does not choose to enter this area in any substantial degree as it leaves open the resolution of the scope of this problem for the District of Columbia Court of Appeals on remand. However, the court does hold that it is "apparent from the Duncan Report, the testimony at the compliance hearing, and even from statements in the District's brief, that in the District of Columbia restraints may be put on dissemination of arrest records * * *." (Citation omitted.) (Majority

opinion at 22.) With this statement I have no great quarrel for I believe that *a* court of the District of Columbia; namely, the United States District Court for the District of Columbia, does have the power to enjoin *unlawful* police practices but only in cases where the Police Department is made a party and the many issues are fairly tried.[5] What I disagree with in the court's opinion is that the D.C. Court of General Sessions, sitting in criminal division, has the power to meet and fairly decide the policy, legality and even the constitutionality of the complained of practices through its assertion of ancillary jurisdiction. The police department is lawfully in possession of these records and only an independent fact-finding proceeding before a court of general equity jurisdiction can be used to test any subsequent unlawful use thereof.[6] I, too, abhor any practice of the Police Department which serves to make available copies of an accused's arrest record, indiscriminately, to the private sector of the community. A man's arrest record, under our system of innocence until proven otherwise, should be of no consequence to those not engaged in official crime prevention and detection, but I am unwilling to replace an evil that exists with an equally evil substitute. However, as a means for identification and apprehension of criminals, an arrest record does serve the police community as a most valuable tool. Nation, state and city-wide crime detection and prevention are based upon a system of information and communication. Statistical experience tells them that persons with arrest records commit a higher percentage of crimes than persons who do not have arrest records.[7] When a young lady notifies the police that eight young nurses have been brutally murdered in their dormitory by a man of a given description, the police take that description and any finger prints

5. Gomez v. Layton, 129 U.S.App.D.C. 289, 394 F.2d 764 (1968).

6. *See* Voelker v. Tyndall, 226 Ind. 43, 75 N.E.2d 548 (1947).

7. *See* UNIFORM CRIME REPORTS—1967, p. 35 (Federal Bureau of Investigation annual publication of Crime in the United States).

taken from the scene and disseminate that information to police officials in the outlying counties and states. Armed with that information, fervent prayer and hard work, the police ofttimes apprehend the killer. Anything tending to disrupt that system should not be lightly undertaken.

The majority opinion, in any event, proceeds to pile brushwood around the stake of effective law enforcement. In the case before Judge Alexander the information was dismissed on the ground that it was brought by an improper prosecutorial authority. At no time was the allegation made that the arrest here in question was improper. Insofar as I can determine there is no authority for the holding of an arrest invalid where prosecution thereon was frustrated by a procedural mishap. The appellant, Morrow, not only succeeded in evading the truth but also achieved the issuance of an order directing virtual expungement of his arrest record. If such treatment is accorded and condoned in this case, then every defendant, whose case terminates in his behalf, has the right, by citing *In re Alexander*, to invoke the "ancillary jurisdiction" of the trial court to enjoin dissemination of his arrest record. I cannot condone such treatment for it is my view, as I have said, that should a defendant desire to enjoin such dissemination on the grounds of illegal arrest or even where a guilty defendant feels that the dissemination is violative of his rights and the applicable law, each should come into the district court and press his right. That is exactly what that court was created for and when it is properly utilized both the system and the right are upheld. To hold otherwise is to transform a government of law into a *goberno a batere*—a government to be fought.

Finally, I turn to the question of whether an order prohibiting dissemination of police records can run against the Police Department where it is not a party named. The majority's position is that since the Corporation Counsel represented the District of Columbia government in the prosecution of this case and since the Police Department is merely a branch of the District government, it can be bound by an order since its duties are relevant to the main proceeding. What this position fails to realize is that the Corporation Counsel wears many hats, and even though each hat bears the District of Columbia label, each signifies a different function. The division which seeks to prosecute would not be the division which sought to defend the Police Department practices. I think fundamental fairness to all interests demands notice and participation by that branch charged with the duty being challenged. For these reasons, I would, respectfully, dissent in .part.