**Rene GARCIA and Carmen Vazquez Alvarez, Plaintiffs–Appellees,**

v.

**Jane S. TEITLER as Personal Representative of Stanley A. Teitler, Deceased,[1] Defendant–Appellant.**

**Docket No. 04–4886 CV.**

United States Court of Appeals, Second Circuit.

Submitted: Dec. 14, 2005.

Decided: March 22, 2006.

---

1. Stanley A. Teitler died during the pendency of these proceedings, and by order of this Court filed October 27, 2005, Jane S. Teitler was substituted as a party pursuant to Fed. R.App.P. 43(a)(1).

David Wikstrom Esq., Law Office of, David Wikstrom, Esq., New York, NY, for Plaintiffs–Appellees.

Stanley A. Teitler Esq., Law Offices of Stanley A. Teitler, P.C., Belle Harbor, NY, Defendant–Appellant.

Before: Hon. ROBERT A. KATZMANN, Hon. RICHARD C. WESLEY, Hon. PETER W. HALL, Circuit Judges.

HALL, Circuit Judge.

Defendant-appellant Stanley Teitler ("Teitler"), an attorney, was retained by plaintiffs-appellees Rene Garcia ("Garcia") and Carmen Vazquez Alvarez ("Alvarez") (together "appellees"), who are husband and wife, to defend them in *United States v. Benjamin Ramos*, 03–Cr–1198 (E.D.N.Y.), against criminal charges that they participated in an international drug

and money laundering conspiracy. The issue of an apparent conflict of interest created by Teitler's joint representation of the two defendants in that case arose early in the proceedings. The District Court held a joint representation hearing pursuant to Fed.R.Crim.P. 44 and *United States v. Curcio*, 680 F.2d 881 (2d Cir.1982), and ruled that Teitler would not be permitted to represent both Garcia and Alvarez. Ultimately, Teitler represented neither.

Garcia and Alvarez demanded a return of the initial fees paid to Teitler, and Teitler claimed he was owed additional fees for services rendered. Following a hearing, the District Court concluded that Teitler had been discharged for cause and ordered him to return the retainer fees paid on behalf of Garcia and Alvarez. Teitler now appeals that judgment, challenging the District Court's jurisdiction and its findings of fact, and further asserting that he was denied certain constitutional rights. For the reasons discussed below, we affirm.

## I. Background

The following is based on the statement of background facts set forth in the July 22, 2004 Memorandum and Order of the District Court; we perceive no clear error in these findings. *See Garcia v. Teitler*, No. 04 CV 832, 2004 WL 1636982, at *1 (S.D.N.Y. July 22, 2004).

### A. *The arrest of Garcia and Alavarez and the retention of Teitler*

On October 29, 2003, Garcia and Alvarez were arrested in Norfolk, Virginia, and ordered removed to the Eastern District of New York. *Id.* Garcia faced charges of conspiracy and possession of narcotics with intent to distribute; Alvarez was charged as a lesser participant in the same conspiracy. *Id.*

Immediately following the arrest, Rebeka Four ("Four")—a family friend—undertook efforts to obtain defense counsel for Garcia and Alvarez. After interviewing several attorneys, Four decided to retain Teitler. When asked which of the two he would represent, Teitler informed Four that the best strategy was for him to represent both and assured her that there would be no conflict of interest. In addition, Teitler cautioned that separate counsel would turn Garcia and Alvarez against each other and increase the risk of conviction. *Id.* at **1–2.

On November 10, 2005, Teitler sent to Four, as agent for Garcia and Alvarez, a single retainer agreement providing for dual representation and requiring an initial payment of $50,000 plus a $5,000 deposit for costs and disbursements. Alvarez's family, however, objected to subsidizing Garcia's defense, so Teitler dispatched separate retainer agreements, each of which called for a $25,000 retainer fee and $2,500 expense deposit. Both agreements were executed and Teitler received a total of $40,000 in retainer fees—$27,500 on behalf of Alvarez and $12,500 on behalf of Garcia. Four conferred with Teitler a number of times and advised him that neither of his clients wanted to incur expenses litigating the joint representation issue. Teitler assured her that the arrangement would be acceptable to the District Court. *Id.* at **2–4.

### B. *The Curcio hearing*

Teitler appeared before the District Court at a status conference on December 2, 2003, although Garcia and Alvarez had not yet been produced in New York. The Government raised the issue of Teitler's representation of both Garcia and Alvarez, and the District Court deferred the matter until Teitler had an opportunity to meet and confer with his clients. On December

5, 2003, appellees met with Teitler for the first time at their arraignment, where the presiding magistrate judge expressed concern about the dual representation arrangement. Because Teitler had not yet discussed the indictment with his clients, a brief adjournment was allowed, during which Teitler told Garcia and Alvarez that the Government's case was "bullshit" and that he would insist on a speedy trial. Garcia and Alvarez each pleaded not guilty, bail was denied with leave to represent, and a temporary order of detention was entered. *Id.* at *3.

In a letter dated December 8, 2003, the Government requested that the District Court convene a *Curcio* hearing to address a number of alleged actual or potential conflicts of interest arising from Teitler's representation of both Garcia and Alvarez. That application was granted, and Teitler represented both Garcia and Alvarez at the December 12, 2003 hearing. The District Court explained the inherent risks in joint representation and questioned Alvarez in order to determine her understanding of the significance of joint representation generally and in the context of the pending prosecution specifically. When asked to explain how "having [appellant] as [her] lawyer could affect [her] decision whether or not to plead guilty," Alvarez responded "I don't know what to answer." Alvarez's response to a question about Teitler's ability to advise her on the issue of cooperation revealed a similar lack of comprehension. Teitler insisted that the circumstances did not present an actual conflict or even the potential for a conflict, but the District Court nonetheless refused to accept a waiver from either Garcia or Alvarez and directed Teitler to inform the court within one week which of his two clients he would continue to represent.[2] *Id.* at **3–4.

## C. *The fee dispute*

Within days of the *Curcio* hearing, Four informed Teitler that neither Alvarez nor Garcia desired his services. Teitler threatened to withdraw as counsel and predicted that Alvarez's bail would be revoked. Teitler further refused to return any of the retainer fees, despite earlier assurances to Four that he would do so, claiming that he first needed to do a statement of billable hours for each defendant. *Id.* at *4.

At a status conference on December 29, 2003, the District Court granted Teitler's motion to be relieved as counsel. Following a failed attempt by the parties to resolve the fee dispute, the District Court held an evidentiary hearing on the matter and ruled that Teitler had been discharged for cause. The District Court further ruled that he had fabricated the additional billing statement "in an effort to justify keeping the $40,000 he had been paid, and to try to obtain another $27,250 in additional fees." *Id.*

## II. Discussion

### A. *The District Court's Exercise of Ancillary Jurisdiction*

Teitler first argues that the District Court's power to exercise ancillary jurisdiction in criminal matters was abolished by Congress when it codified supplemental jurisdiction at 28 U.S.C. § 1367. Section 1367, passed as part of the Judicial Improvement Act of 1990, provides in relevant part:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within

2. At the hearing, the government also agreed to release Alvarez on bail. [A. 77].

such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a). Appellant argues that because this section applies only to "civil action[s]," by implication, criminal ancillary jurisdiction must have been eliminated. We disagree.

■ It is a basic rule of statutory construction that a court begin with "the plain and ordinary meaning of statutory terms." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 56 (2d Cir.2002). We think the statute means exactly what it says; in civil cases, a court may exercise "jurisdiction over all other claims that are so related to the claims" over which the court has original jurisdiction. 28 U.S.C. § 1367(a). Although § 1367 says nothing of criminal matters, it does not follow that a court may not exercise ancillary jurisdiction in a criminal case. Indeed, a district court's jurisdiction over criminal matters is defined by an entirely separate title of the United States Code. *See* 18 U.S.C. § 3231 (providing that "the district courts of the United States shall have original jurisdiction ... of all offenses against the laws of the United States"). In adding § 1367 to the provisions of Title 28 dealing with civil jurisdiction, Congress could not have intended to effect so sweeping a change to criminal jurisdiction as appellant would have us hold.

Our holding is buttressed by the fact that courts have long exercised ancillary jurisdiction in criminal matters. In *United States v. Schnitzer*, 567 F.2d 536, 538 (2d Cir.1977), for example, we held that the district court had ancillary jurisdiction to address a motion by a criminal defen-

dant to have his arrest record expunged, and fingerprints and arrest photographs returned, following the dismissal of his indictment. We have also held that a district court has ancillary jurisdiction to address a motion for the return of seized property. *See Rufu v. United States*, 20 F.3d 63, 65 (2d Cir.1994); *Soviero v. United States*, 967 F.2d 791, 792 (2d Cir.1992); *Mora v. United States*, 955 F.2d 156, 158 (2d Cir.1992). Other courts have similarly held that a district court has ancillary jurisdiction to expunge criminal records, *see, e.g., United States v. Sumner*, 226 F.3d 1005, 1014 (9th Cir.2000); *Morrow v. District of Columbia*, 417 F.2d 728, 740 (D.C.Cir.1969), or to entertain post-conviction motions for the return of seized property, *see, e.g., Okoro v. Bohman*, 164 F.3d 1059, 1061 (7th Cir.1999); *Thompson v. Covington*, 47 F.3d 974, 975 (8th Cir.1995); *United States v. Martinson*, 809 F.2d 1364, 1370 (9th Cir.1987); *United States v. Wilson*, 540 F.2d 1100, 1103 (D.C.Cir.1976).

■ We should "assume ... that Congress legislated against a background of law already in place and the historical development of that law." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, — U.S. —, —, 125 S.Ct. 2611, 2636, 162 L.Ed.2d 502 (2005) (Ginsburg, J., dissenting). Given that courts had recognized their power to exercise ancillary jurisdiction in criminal matters prior to the passage of the Judicial Improvement Act of 1990, we should not read § 1367 so broadly as to eliminate that power. The fact that we have exercised ancillary jurisdiction *following* passage of the 1990 Act further informs our decision not to read § 1367 as a limit on a court's power to exercise ancillary jurisdiction in criminal matters. *See Rufu*, 20 F.3d at 65; *Soviero*, 967 F.2d at 792; *Mora*, 955 F.2d at 158.

■ Of course, this does not end our inquiry as we still must decide whether fee

disputes during an ongoing criminal case, and as a result of a disqualification following a *Curcio* hearing, fall within a district court's ancillary jurisdiction powers. The boundaries of ancillary jurisdiction are not easily defined and the cases addressing it are hardly a model of clarity. *See Kokkonen v. Guardian Life Ins. Co. of America,* 511 U.S. 375, 379, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994) (noting that "[t]he doctrine of ancillary jurisdiction can hardly be criticized for being overly rigid or precise"); *Morrow,* 417 F.2d at 739 (" 'At least so far as we are aware no court has ever tried to fix [the] limits [of the ancillary jurisdiction doctrine] with any degree of precision.' ") (quoting *Walmac Co. v. Isaacs,* 220 F.2d 108, 113–14 (1st Cir. 1955)).

At its heart, ancillary jurisdiction is aimed at enabling a court to administer "justice within the scope of its jurisdiction." *Morrow,* 417 F.2d at 737 (internal quotation marks omitted); *see also Jenkins v. Weinshienk,* 670 F.2d 915, 918 (10th Cir.1982) ("Ancillary jurisdiction rests on the premise that a federal court acquires jurisdiction of a case or controversy in its entirety. Incident to the disposition of the principal issues before it, a court may decide collateral matters necessary to render complete justice."). Without the power to deal with issues ancillary or incidental to the main action, courts would be unable to "effectively dispose of the principal case nor do complete justice in the premises." *Morrow,* 417 F.2d at 738 n. 36 (internal quotation marks and citation omitted); *id* at 740 ("The major purpose of ancillary jurisdiction ... is to insure that a judgment of a court is given full effect; ancillary orders will issue when a party's actions, either directly or indirectly, threaten to compromise the effect of the court's judgment."). Along these lines, the Supreme Court has instructed that ancillary jurisdiction may be exercised "for two separate, though sometimes related, purposes: (1) to permit disposition of claims that are, in varying respects and degrees, factually interdependent by a single court, and (2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." *Kokkonen,* 511 U.S. at 379–80, 114 S.Ct. 1673 (internal citations omitted).

Whatever the outer limits of ancillary jurisdiction may be, we hold that resolving a fee dispute after an attorney withdraws following a *Curcio* hearing is within a district court's ancillary powers, as it relates to the court's ability to "function successfully." Indeed, we have long approved of the exercise of ancillary jurisdiction by district courts to resolve fee disputes arising in civil cases. In *National Equip. Rental, Ltd. v. Mercury Typesetting Co.,* 323 F.2d 784 (2d Cir.1963), for example, we held that a district court had power "ancillary to its conduct of the litigation," to "condition the substitution of attorneys in litigation pending before it upon the client's either paying the attorney or posting security for the attorney's reasonable fees and disbursements." *Id.* at 786. As we explained, this is because the termination of the attorney/client relationship relates to the "protection of the court's own officers." *Id.* at 787 n. 1; *see also Petition of Rosenman Colin Freund Lewis & Cohen,* 600 F.Supp. 527, 531 (S.D.N.Y. 1984) (court has jurisdiction over law firm's proceedings to establish a lien against judgment for the recovery of attorney's fees); *Marrero v. Christiano,* 575 F.Supp. 837, 839 (S.D.N.Y.1983) (court has ancillary jurisdiction to entertain petition to fix lien for attorney's fees).

In *Grimes v. Chrysler Motors Corp.* 565 F.2d 841 (2d Cir.1977), moreover, we held that a district court could exercise ancillary jurisdiction to resolve a fee dispute

between attorneys in an underlying personal injury suit, as it related to the distribution of settlement funds. *Id.* at 844. The "distribution of the ... settlement funds and ... determination of appropriate disbursements," we explained, "was clearly ancillary to [the district court's] approval of the settlement in the [underlying] case." *Id.* Finally, in *Cluett, Peabody & Co., Inc. v. CPC Acquisition Co., Inc.,* 863 F.2d 251 (2d Cir.1988), a case in which a law firm sought attorney's fees from its client for services rendered in an underlying federal action, we held that the district court properly exercised ancillary jurisdiction as the "fee dispute was properly related to the main action." *Id.* at 256.

In light of these decisions, appellant concedes that "[h]ad the underlying federal case [here] been a civil suit, [the] fee dispute" could have been resolved pursuant to a court's ancillary jurisdiction powers. We reject appellant's attempts to distinguish these cases on the ground that the present dispute arises from a criminal matter; the fee dispute here was properly related to the main action, and in managing that proceeding, it was necessary for the court to resolve it.

The genesis of the present dispute was a *Curcio* hearing, which is itself ancillary to the underlying criminal action. Such proceedings are necessary, as a district court must, on the one hand, ensure that a defendant's representation does not raise any conflict of interest and, on the other hand, protect a defendant's Sixth Amendment right to effective assistance of counsel, which includes the right—albeit qualified—to counsel of one's own choosing. *See United States v. Jones,* 381 F.3d 114, 119 (2d Cir.2004); *United States v. Perez,* 325 F.3d 115, 125 (2d Cir.2003); *see also United States v. Gonzalez–Lopez,* 399 F.3d 924, 928–29 (8th Cir.2005) (discussing right of defendant to counsel of his own choosing

balanced against the need of the court to administer justice). A court's administrative duties, including ancillary hearings if necessary, are similarly related to legal representation for indigent defendants who have a right to appointed counsel. *See United States v. Nivica,* 887 F.2d 1110, 1121 (1st Cir.1989) (citing *Gideon v. Wainwright,* 372 U.S. 335, 344, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)); *see also* 18 U.S.C. 3006A(a)(1)(H) (requiring district courts to set up a plan for the representation of indigent defendants and requiring, as part of that plan, representation of those entitled to counsel under the Sixth Amendment). Any or all of these concerns, which a court undoubtedly has the authority (and hence, jurisdiction) to address, necessarily implicate attorney's fees.

Although both Garcia and Alvarez have been able to obtain new counsel, the record reflects that they are of limited means and that the funds paid to Teitler may be needed to pay their new counsel. *Garcia v. Teitler,* 2004 WL 1636982, at *5. In order to guarantee a defendant's right to choose his own counsel where, as here, his criminal case is ongoing, and to avoid the possibility of defendants becoming indigent and requiring the appointment of counsel, a district court must be able to exercise ancillary jurisdiction to resolve a fee dispute. *See Novinger v. E.I. DuPont de Nemours & Co., Inc.* 809 F.2d 212, 217 (3rd Cir.1987) (noting that while "[a]ttorneys' fee arrangements ... are matters primarily of state contract law ... the federal forum has a vital interest in those arrangements because they bear directly upon the ability of the court to dispose of cases before it in a fair manner"); *United States v. Weissman,* No. S2 94 CR 760, 1997 WL 334966, at *6 (S.D.N.Y. June 16, 1997) (exercising ancillary jurisdiction to decide whether, under an indemnity agreement, a company was required to continue to advance funds for defendant's legal pro-

ceedings as "resolution of [the] dispute might impact ... the conduct of the matter that gives rise to the court's original jurisdiction").[3] In fact, both defendants here are currently represented by counsel provided pursuant to the Criminal Justice Act, 18 U.S.C. 3006A ("CJA"), which allows the court to recover funds from a defendant when the court finds that such funds are available. 18 U.S.C. 3006A(f); *see also United States v. Bracewell*, 569 F.2d 1194, 1197 (2d Cir.1978) (noting that "the reimbursement statute, which was duly enacted to carry out salutary policies ... creates a constitutionally proper ground for depriving a financially able defendant of available funds which, in fairness, should be remitted to the public coffers"); *cf. United States v. Parker*, 439 F.3d 81, 105 (2d Cir.2006) (noting that the district court must be involved in managing CJA funds so as to "discourag[e] a few opportunistic attorneys from utilizing substantial partial retainers that, after quickly being exhausted, would then require the use of CJA funds"). As such, it is in the interest of the court to resolve the fee dispute here, and the court must, therefore, be able to exercise ancillary jurisdiction in order to do so.

We hold that the District Court properly exercised jurisdiction over the parties' fee dispute.

## B. *The District Court did not err in ordering Teitler to return unearned attorney fees*

Teitler asserts that even if we find that the District Court had jurisdiction to entertain the fee dispute, the District Court's conduct of the proceedings violated his constitutional rights and it clearly erred in finding that (a) Teitler ignored a conflict of interest by representing two clients and (b) Teitler falsified billing records to justify his fee. Neither of these arguments constitutes grounds for reversal.

### 1. *Alleged constitutional infirmities*

■ Teitler contends that the District Court's partiality deprived him of a fair trial on the fee dispute. Certainly, Teitler was entitled to an impartial forum, *see Liteky v. United States*, 510 U.S. 540, 555–56, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994), but the record does not establish that the District Court was biased against him. Teitler asserts that the District Court's bias is evidenced by the fact that it advised Four to contact the disciplinary authorities regarding Teitler's treatment of Garcia and Alvarez and provided Four with the relevant contact information. In fact, the District Judge stated,

> If [Garcia and Alvarez] don't want him to represent them, all they need to do is

---

**3.** Appellant's reliance on *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), is misplaced. That case involved "pendent claim" jurisdiction, i.e., a situation in which a plaintiff has brought a claim over which a court has original jurisdiction but also seeks to have the court exercise jurisdiction over parallel state claims. In *Gibbs*, the Court held that pendent jurisdiction could be exercised to the extent that the state and federal claims derived from a "common nucleus of operative fact." *Id.* at 725, 86 S.Ct. 1130. In the present case, however, we are concerned not with the situation in which there is a separate, but related claim such as in *Gibbs*, but rather with the court's

ability, as described in *Kokkonen*, 511 U.S. at 380, 114 S.Ct. 1673, to "manage its proceedings, vindicate its authority, and effectuate its decrees." It may be a misnomer in a case such as the latter to use the term "ancillary jurisdiction." *See* Christoper Green, Note, *Justice Scalia and Ancillary Jurisdiction: Teaching a Lame Duck New Tricks in Kokkonen v. Guardian Life Ins. Co. of America*, 81 VA. L. REV. 1631, 1660 (1995) (suggesting that these types of proceedings are more appropriately characterized as an exercise of a court's "inherent power"). Whatever the appropriate term, the court's exercise of power to resolve the fee dispute was proper.

tell him he's fired. If he's broken an agreement to return money that he had with his former clients, they should go to the disciplinary committee for the bar. I'll get you the address and the number. If he's made threats to them or to their family and you think these threats are improper or illegal, tell the U.S. Attorney. If they can't afford a lawyer to represent them, one will be appointed for them.

These remarks simply describe the process for addressing certain attorney/client disputes and do not suggest any bias against Teitler on the part of the District Court.

Teitler also complains about remarks that the District Court made regarding his behavior during the evidentiary hearing and in the subsequent written decision, including the Court's statement that Teitler was "unethical" and a "bad professional." In fact, the District Court's Memorandum and Order quoted Justice Sandra Day O'Connor as having said that lawyers are depicted in films as unethical and bad professionals, attributing partial responsibility for that phenomenon to the "decline of professionalism." *Garcia*, 2004 WL 1636982, at *1. The District Court then stated that "[t]his unfortunate case is an illustration of that decline." *Id.* The District Court's remarks, and even Teitler's exaggerated characterization of them, do not approach the type or severity of antagonism that would support a finding that Teitler was deprived of a fair hearing. *See Liteky*, 510 U.S. at 555–556, 114 S.Ct. 1147 (noting that "expressions of impatience, dissatisfaction, annoyance, and even anger" by a judge do not establish bias or partiality).

██ Teitler further asserts that the District Court's *in camera*, on-the-record audience with Four, and its subsequent filing of the transcript under seal, deprived him of his right to confront his accuser, or at least constituted an erroneous admission of evidence. This assertion is similarly without merit. In this ancillary dispute over fees, Teitler's invocation of the Sixth Amendment is misplaced. The record, moreover, does not reflect that the District Court admitted into evidence any of Four's *in camera* remarks. The District Court held an evidentiary hearing on the fee dispute issues during which Teitler had the opportunity to call and cross-examine witnesses, including Four, as well as to offer and object to the admissibility of evidence.

### 2. *Findings of fact*

██ We review a district court's factual findings, including those based on documentary evidence and inferences drawn from other facts, for clear error. *Krizek v. Cigna Group Ins.*, 345 F.3d 91, 99 (2d Cir.2003). A district court's findings, particularly its credibility determinations, are entitled to deference. *Phoenix Global Ventures, LLC v. Phoenix Hotel Assocs., Ltd.* 422 F.3d 72, 76 (2d Cir.2005). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

### a. The District Court's finding that Teitler was dismissed for cause is not clearly erroneous

██ Under New York law, an attorney may be dismissed by a client at any time with or without cause. *Universal Acupuncture Pain Servs., P.C. v. Quadrino & Schwartz, P.C.*, 370 F.3d 259, 263 (2d Cir.2004). If the discharge is for cause, the attorney is not entitled to fees. If, however, the discharge is without cause,

the attorney may recover the value of services rendered in *quantum meruit. Id.* Poor client relations, differences of opinion, or personality conflicts do not amount to cause, which is shown by impropriety or misconduct on the part of the attorney. *See, e.g., Klein v. Eubank,* 87 N.Y.2d 459, 463, 640 N.Y.S.2d 443, 663 N.E.2d 599 (N.Y.1996).

▇ The District Court found that Teitler was discharged for cause. Far from constituting clear error, the finding is well-supported. The District Court adhered to proper procedure, convening a *Curcio* hearing when the Government raised the issue of Teitler's joint representation of Garcia and Alvarez. *See United States v. Velez,* 354 F.3d 190, 198 (2d Cir. 2004) (when counsel suffers from an actual or potential conflict, trial courts are required to conduct a *Curcio* hearing to determine whether defendant's waiver of conflict-free representation is knowing and intelligent). The District Court's finding that the alleged waiver by Alvarez was not knowing and intelligent is plainly supported by her inability to articulate (even with the assistance of an interpreter) any understanding of the potential conflicts attending joint representation. This inability persisted despite a thorough explanation of the matter by the District Court. Having determined that Alvarez's agreement to the joint representation was not knowing and intelligent, there was no need to question Garcia, and thus the District Court did not err, as Teitler suggests, by not doing so.

During the *Curcio* hearing, Teitler vigorously defended the propriety of joint representation in this case, denied that any potential or actual conflict existed, and represented that he had not discussed the issue with his clients. Furthermore, Teitler now advances a spousal privilege theory which he never once asserted at the *Curcio* hearing, although he had the opportunity. Any spousal privilege, however, would have belonged to Garcia and Alvarez regardless of whether they were jointly represented. The District Court ultimately found that Teitler was disqualified from representing both Garcia and Alvarez, though it left open the option of his continued representation of one of them.

At the evidentiary hearing on the fee dispute, Four testified that Teitler informed her at their first meeting that joint representation was critical to avoiding incarceration and that the intervention of another attorney would increase the risk that one would jeopardize the case of the other. Garcia testified that Teitler dismissively referred to the Government's case against him as "bullshit" and made efforts to dissuade him from cooperating, instead urging Garcia to go to trial. For her part, Alvarez testified that Teitler advised her that he would inform the Government that Garcia would cooperate in order to get them to drop the case against her, but that if the plan did not work, she should simply testify against Garcia. Alvarez further stated that Teitler advised her that if she had separate counsel she could count on going to jail for 10 years. Four testified that Teitler threatened to file an application withdrawing as counsel if he was discharged, which he said would result in a revocation of Alvarez's bail. Based on this testimony, we cannot conclude that the District Court committed any error by finding on these facts, among others, that Teitler was discharged by Garcia and Alvarez for cause.

Teitler's assertion that the finding of discharge for cause was erroneous because he voluntarily withdrew is not supported by the record, which reflects that Garcia discharged him immediately following the evidentiary hearing on December 12, 2003,

and that Alvarez discharged him by telephone after he refused to return Garcia's retainer. Alvarez testified, moreover, that the day after she fired Teitler, he called her to say that he was withdrawing.

### b. The finding of inadequately supported and fraudulent billing is sufficiently supported

▆ Teitler also challenges the District Court's finding that Teitler falsified time records in an effort to support his fee demand. Following his refusal to return the remainder of Garcia's retainer, despite written requests to do so, Teitler submitted a bill for services of more than $27,000. The District Court found that the bill was "a fabrication" and a "crude attempt to justify the retention of" unearned fees. *Garcia*, 2004 WL 1636982, at *4. Among the factors supporting the District Court's finding were entries for telephone calls that were either undocumented or that lasted for periods of time shorter than claimed. Teitler billed Appellees for thirty-five hours of phone time at $500 per hour, but only approximately four and a half hours were supported by Teitler's phone records. Teitler's attempts to explain the phone billing were incoherent and support the District Court's adverse credibility finding. *Id.*

Teitler's argument that he was deprived of timely discovery which would have supported his phone billing is without merit. Teitler complains that Garcia and Alvarez's attorney failed to respond to a document request for Four's phone records, which he claims support the number of incoming calls identified on the billing statement. First, it is highly unlikely that Four's records were under the custody and control of an attorney who did not represent her. Second, even assuming that all of the incoming calls reported on Teitler's phone records concerned Garcia and Alva-

rez, they do not support the amount of telephone time Teitler claimed.

The District Court also looked skeptically at the amount of time that Teitler claimed he devoted to research. In doing so, it analyzed the issue against the backdrop of Teitler's endless recitation of his qualifications and accomplishments, finding that it was not credible that Teitler, an experienced criminal defense attorney, would spend four-and-a-half hours researching the elements of a narcotics conspiracy or six hours researching speedy trial issues. *Id.* at *4. Appellees drew the Court's attention to other suspicious time entries, such as one and three-quarters hours to analyze the complaint, two and seven-tenths hours to review the Canons of Ethics, and four and six-tenths hours to research and consult outside experts regarding conflict of interest issues.

On this record, we agree with the District Court that even if Teitler had been discharged without fault, he would have been entitled to very little in the way of fees. *Id.* at *7. The factors relevant to a *quantum meruit* analysis do not support a finding that Teitler is entitled to the fees he claims. *See, e.g., Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 148 (2d Cir.1998) (Under New York law, assessment of *quantum meruit* legal fees is based on consideration of "the difficulty of the matter, the nature and extent of the services rendered, the time reasonably expended on those services, the quality of performance by counsel, the qualifications of counsel, the amount at issue, and the results obtained."). Rather, the evidence supports the District Court's determination that Teitler "spent very little time on the matter, and appears to have devoted that time exclusively to an ill-advised effort to jointly represent both defendants." *Garcia*, 2004 WL 1636982, at *7.

### III. Conclusion

We have reviewed all of Teitler's remaining claims and find them to be without merit. Based on the foregoing, the judgment of the District Court in favor of Garcia and Alvarez is AFFIRMED.