In the Matter of Anthony A. STABILE and Stephen E. Saracco, Respondents.

United States of America,

v.

The New York Racing Association, Inc., Defendant.

Cr. No. 03–1295.

United States District Court, E.D. New York.

June 15, 2006.

Getnick & Getnick, by Neil V. Getnick, Esq., and Margaret J. Finerty, Esq., New York, NY, Court Appointed Monitor.

Aiello & Cannick, by Robert J. Aiello, Esq., Maspeth, NY, for the Respondents.

### MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This is a case of first-impression that requires the Court to consider the extent of its jurisdiction and the remedies available to address alleged improper interference with a court-appointed monitor. The court appointment of monitors in conjunction with deferred prosecution agreements is an increasingly common tool used by prosecutors in cases involving corporate malfeasance. Generally, the consensual arrangement places the monitor in an investigative, quasi-prosecutorial, and quasi-judicial role that is unique in our legal system. In this case, although the term of the monitor's appointment had ended, the monitor petitioned the Court alleging that the respondents, who were non-parties to the original indictment, had attempted to interfere with its authority in an improper manner. This novel and interesting situation requires the Court to address the following questions: (1) Whether the Court has jurisdiction; (2) whether there are any available remedies to address the alleged actions of the respondents; and (3) whether there should be a hearing to determine any facts in dispute.

## I. BACKGROUND

In December 2003, a grand jury sitting in the Eastern District of New York indicted the New York Racing Association ("NYRA") and six individuals on charges of conspiracy to defraud the Unites States, in violation of 18 U.S.C. § 371, and aiding and abetting the filing of false tax returns, in violation of 26 U.S.C. § 7206(2). The NYRA is a non-profit corporation licensed by the State of New York to operate thoroughbred racetracks throughout the state, namely, Aqueduct Raceway, in Ozone Park, New York; Saratoga Racecourse, in Saratoga Springs, New York; and Belmont Park, in Elmont, New York (collectively the "NYRA Racetracks"), widely known for its race the "Belmont Stakes," the third and final leg of the Triple Crown in horse racing.

Shortly after the Indictment was filed, on December 10, 2003, the NYRA entered into a Deferred Prosecution Agreement ("DPA") and a Stipulation of Facts with the United States Attorney's Office for the Eastern District of New York ("USAO"). The Stipulation of Facts memorialized an investigation that revealed a far-reaching fraud involving misconduct by employees of NYRA's Pari–Mutuel Department. The Pari–Mutuel Department conducted the betting operations for NYRA. Pari Mutuel tellers were responsible for selling tickets and vouchers to the public from betting terminals at the NYRA Racetracks, and for paying cash winnings to individuals holding winning betting tickets.

From 1980 through 1999, employees of the Pari–Mutuel Department devised and operated a scheme in which they would routinely extract money from their cash drawers, falsely report shortages, receive payroll deductions for such shortages, and declare the deducted wages as un-reimbursed business expenses on their income tax returns. Collectively, the employees unlawfully deducted approximately $19 million from their federal income tax returns as part of this massive tax fraud scam. Apparently, NYRA senior management were aware of and permitted this unlawful conduct in order to keep the Pari–Mutuel employees happy, and to ensure that the employees would not slow down the processing of betting transactions.

The DPA that was offered to the NYRA gave it the opportunity to avoid criminal conviction under the Indictment, if it complied with certain conditions. The DPA was an innovative collaborative effort between federal and state authorities. Although the Indictment was restricted to the unlawful activities involved in the Para–Mutuel scheme, the DPA required the NYRA to submit to a complete organizational restructuring. This was in recognition of the fact that faulty accounting and reporting practices enabled such a long-term and systematic tax evasion scheme to exist.

In addition, prior to the Indictment, both the New York State Comptroller's Office (the "Comptroller") and the New York State Attorney General's Office had issued official reports detailing the need for the NYRA to reform its operating practices, policies, and procedures. The Comptroller's Report was particularly detailed and revealed numerous weaknesses and illegal activities at the NYRA. The report recommended that an Independent Private Sector Inspector General ("IP-SIG") be appointed with the legal, auditing, investigative, management, and loss prevention skills to ensure compliance with relevant laws and to deter, prevent, uncover, and report unethical and illegal conduct within NYRA.

Within this back drop, the DPA was structured to require the NYRA to agree to the appointment of an independent mon-

itor by the Court to effectuate the organizational restructuring recommended in the Comptroller's report. The DPA also required the NYRA to report to, and be directed by, a government agency to be designated by the USAO.

On March 1, 2004, the Court entered an order appointing the Law Firm of Getnick & Getnick to serve as the monitor of NYRA ("Monitor") for a period beginning from the date of the order through July 1, 2005 ("Appointing Order"). The Appointing Order also designated the Comptroller to be the government agency that would have the power and authority to direct the Monitor along with the USAO. Under the Appointing Order, the Monitor was given the authority to (1) monitor the NYRA's compliance with the terms of the DPA; (2) monitor the NYRA's business and operations for compliance with federal, state, and local laws; and (3) suggest structural reforms to help ensure compliance after the term of the monitor ended.

The Appointed Monitor set out to conduct the monitorship as an IPSIG consistent with the call for reform set forth in the Comptroller's Report. In undertaking such reform, the Monitor took an approach that "good conduct is good business" and instituted what it called the "Four Pillars of Good Conduct: Integrity; Transparency; Good Governance; and Social Responsibility." Monitor's Report at 3. These principles were applied consistently to the substantial structural and cultural reforms initiated and supervised by the Monitor.

One of the areas identified by the Monitor that was in need of reform was an area of the racetrack known as the backstretch. The backstretch is the colloquial term used for the community of workers, some of whom reside on the NYRA grounds, that are responsible for caring for the horses. It is comprised of grooms, stable hands, exercise riders and hot walkers. The backstretch workers are not employed by the NYRA, but directly by trainers who stable their horses at the racetrack.

During the monitorship the Monitor established a regular on-track presence and built a strong rapport with the backstretch community in order to identify and address the concerns of backstretch workers. In the Monitor's Final Report it noted that "[n]owhere on the track is the need for social responsibility more visible than on the backstretch." Monitor's Final Report at 16. The report explained that the backstretch was comprised largely of Latino immigrant workers who lived in substandard conditions such as dilapidated dormitories. They are underpaid and are compelled to work seven days a week in order to keep their jobs. The Report noted that it received numerous reports of employee mistreatment on the backstretch, including sexual harassment, discrimination, and verbal and physical abuse.

On February 4, 2005, during the course of its investigation, two of the Appointed Monitor's investigating agents encountered the respondent Anthony A. Stabile ("Stabile") in the backstretch area. Stabile is an independent contractor licensed by the New York State Racing and Wagering Board as a jockey agent and trainer and was credentialed by the NYRA to conduct business on NYRA Racetracks, but not as an employee. Jockey agents represent jockeys, and employ various methods for promoting and drumming up potential riding engagements for their clients. Presumably, part of Stabile's work required him to have a presence on the backstretch. Allegedly, during the encounter, investigators for the Monitor and NYRA officials requested that Stabile produce his NYRA credentials, and he refused. Stabile then verbally threatened to cause serious physical injury to one of the investigators. This incident was reported to the USAO, and

also included in the Monitor's status report to the Court that was made on February 23, 2005.

The NYRA took action against Stabile for the misconduct. In June 2005, the NYRA, through its Backstretch Area Violations Panel ("BAVP"), held a hearing on two charges against Stabile: (1) "On or about February 4, 2005 you threatened to cause physical injury to a Federal Monitor while in the performance of his official duties;" and (2) "On or about February 4, 2005 you refused to produce your NYRA credentials when requested by another Federal Monitor acting in his official capacity." The BAVP ruled against Stabile and revoked his credentials and privileges to conduct business at the NYRA Racetracks. Stabile appealed the ruling to the NYRA CEO Charles Hayward, and that appeal was denied. Stabile subsequently retained John Esposito, Esq., and respondent Stephen E. Saracco, Esq., ("Saracco") to represent him in an Article 78 proceeding commenced in New York State Supreme Court, Nassau County, challenging the actions taken by the NYRA and the BAVP.

On September 13, 2006, after an extension of the original 16 month term, the Appointed Monitor filed its Final Report finding that the NYRA had complied with the DPA entered into with the USAO. Simultaneous with the termination of the monitorship, the Court, on motion from the government, dismissed the indictment with prejudice.

Although the term of the monitorship had ended, on May 3, 2006 the Monitor petitioned the Court in a letter to make a formal complaint against Stabile and Saracco (collectively the "Respondents") for attempting to interfere with the Monitor in an improper manner. According to the petition filed by the Monitor, both Stabile and Saracco approached the Monitor shortly after the monitorship had ended in an alleged attempt to have the Monitor exploit its court-granted status in an improper way, and to the detriment of the NYRA, in an effort to have Stabile's NYRA credentials reinstated. In response to the application by the Monitor, this Court issued an order to show cause requiring Stabile and Saracco to appear on May 8, 2006, and to respond to the allegations made in the petition to the Court.

In the petition, the Monitor specifically referenced two incidents of post-monitorship contact. The first allegedly occurred on September 22, 2006, when Stabile placed a telephone call to Neil Getnick, Esq., ("Getnick"), in his capacity as a member of Getnick & Getnick, the former Monitor. Stabile allegedly asked, among other things, why he had been excluded from the NYRA. Getnick directed Stabile to the NYRA for that answer, and in response, Stabile asked whether in the absence of an answer from Getnick, he would have to disseminate certain information about the agents of the Appointed Monitor, which the Monitor described as false and disparaging information.

The second incident occurred on April 5, 2006, when Saracco placed a telephone call to Getnick in which Saracco allegedly asked either Getnick or the former Monitor to exert pressure on NYRA to reinstate Stabile's credentials and compensate him for his lost time. During the conversation Saracco allegedly stated that Stabile was planning a lawsuit and that certain members of the Monitor's team would be named as defendants. Saracco also stated that Getnick, individually, and the firm of Getnick & Getnick, might be named as defendants. On April 17, 2006, Saracco left a follow-up voice mail message for Getnick asking whether he had taken efforts to resolve the matter.

On May 8, 2006, the Court held a hearing with regard to the charges filed by the Monitor against Stabile and Saracco. The Respondents disputed the jurisdiction of this Court to entertain such a complaint by the Monitor. They contended that the appropriate forum to address a complaint regarding alleged interference with a federal-court-appointed monitor is in state court or with a law enforcement agency. As to the factual allegations, Saracco stated at the hearing that he only made calls to the Monitor in a good faith effort to avoid lawsuits and settle the litigation, and that all of his telephone calls were cordial and non-adversarial. Without admitting the details of the conversation, Stabile acknowledged that he placed a telephone call to the Monitor on September 22, 2005, but stated that the Monitor explicitly invited complaints to its office through postings throughout the NYRA facilities. After hearing argument, the Court directed the parties to submit letter briefs on the various issues.

Following the parties appearance before this Court, the State court in the Article 78 proceeding found that Stabile's due process rights were violated when the BAVP conducted a disciplinary hearing without taking testimony or evidence. The court ordered that the NYRA reinstate Stabile's credentials until a new and proper hearing could be conducted. On May 22, 2006, the BAVP convened a hearing as directed by the state court. Both the NYRA and Stabile were represented by counsel. On May 29, 2006, the NYRA suspended Stabile's credentials based on an alleged threat that he made to a NYRA official serving as a member of the BAVP adjudicating Stabile's case while the case was pending. On May 30, 2006, the BAVP issued its ruling, finding Stabile guilty on all charges brought against him, including the altercation with the Monitor's investigator and the use of offensive and menacing language. The decision stated, "[u]pon a finding of guilt and, a subsequent review of Mr. Stabile's past history at NYRA, it is the decision of the Barn Area Violations Panel that Anthony Stabile's NYRA issued credentials be permanently revoked and, that he be prohibited from entering NYRA owned property." BAVP Decision at 2.

The petition by the Monitor asks the Court to exercise its jurisdiction under the All Writs Act and, after an evidentiary hearing, permanently enjoin Stabile, Saracco, and their representatives from having any further communications or contact with the offices of the former Monitor and all members of the Monitor's team. The Court will now discuss the propriety of such a request for relief.

## II. DISCUSSION

The All Writs Act, 28 U.S.C. § 1651(a), provides that federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." *Id.* The Act authorizes the issuance of "such commands ... as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *United States v. New York Telephone Co.*, 434 U.S. 159, 172, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977). However, it is well-settled that the All Writs Act, by itself, "does not confer jurisdiction on the federal courts...." *Syngenta Crop Protection, Inc. v. Henson*, 537 U.S. 28, 29, 123 S.Ct. 366, 368, 154 L.Ed.2d 368 (2002); *Covanta Onondaga Ltd. v. Onondaga County Resource Recovery Agency*, 318 F.3d 392, 395 (2d Cir.2003). Rather, the All Writs Act may only be used in the context of an already existing case or controversy that is within the subject matter jurisdiction of the federal court. *See id.*

## A. Subject Matter Jurisdiction

■ Stabile and Saracco argue that the Court lacks subject matter jurisdiction in this case because Getnick & Getnick's status as the court-appointed monitor has ended and the underlying criminal case was dismissed with prejudice. The Respondents also contend that the only available avenues of relief are in the pending Article 78 proceeding in New York State Supreme Court, or with a law enforcement agency. The Court disagrees.

As a general proposition, it has been said that a court's subject matter jurisdiction over a criminal prosecution of an offense ends upon the dismissal of the indictment. *See United States v. Villamonte–Marquez,* 462 U.S. 579, 597–98, 103 S.Ct. 2573, 2584, 77 L.Ed.2d 22 (1983) (Brennan, J., dissenting); *see also Ex parte Bain,* 121 U.S. 1, 13, 7 S.Ct. 781, 787, 30 L.Ed. 849 (1887) ("[T]he court has no right to proceed any further in the progress of the case for want of an indictment."). However, in the rare cases that have recently addressed the federal court's subject matter jurisdiction, it has been understood that subject matter jurisdiction over a criminal case does not necessarily end at the close of the proceedings. *See United States v. Mercurris,* 192 F.3d 290, 293 (2d Cir.1999) (holding that a criminal case does not become jurisdictionally moot when the defendant finishes his sentence). In fact, Rule 48(a) of the Federal Rules of Criminal Procedure ("Fed. R.Crim.P."), which once stated that upon the dismissal of the indictment, "the prosecution shall thereupon terminate ...," *Villamonte–Marquez,* 462 U.S. at 595, 103 S.Ct. 2573, 77 L.Ed.2d 22, no longer contains such clause. Fed.R.Crim.P. 48(a).

In this case the Appointing Order addressed the possibility that jurisdiction over the criminal matter may need to be extended beyond the life of the indictment to deal with potential violations of the order. The Appointing Order provides that the Monitor has the authority to "petition the Court ... if this Order is violated in any manner; in the event that such a petition becomes necessary the term of the Monitorship may, in the Court's discretion, be tolled up to the amount of time required for the Court to decide the petition." Appointing Order at 3. Thus, the filing of a petition by the Monitor may, in the Court's discretion, extend the term of the monitorship and the Court's jurisdiction in the criminal case.

This Court was first advised on February 23, 2005, of Stabile's alleged physical threats against the monitor, which was within the time frame of the monitorship. The fact that this petition was filed after the Monitor's term had expired, and included facts and incidents that occurred outside the time frame of the monitorship, does not preclude this Court from using its discretion to toll the term of the monitorship and exercise its jurisdiction to address the petition. Under the Appointing Order this Court is the only forum available to the Monitor to seek redress for potential infractions regarding its appointment. The State court that the Respondents claim is the proper forum has no jurisdiction to entertain an application under an order entered by a federal court in a criminal matter.

Accordingly, having been apprised of potential violations of the Appointing Order, the Court finds it necessary to exercise its discretion and toll the term of the monitorship and this Court's subject matter jurisdiction for the limited purpose of deciding the complaints made by the Monitor in this case.

■ Assuming that jurisdiction over the indictment could not be extended by the Appointing Order, and had ended immedi-

ately upon dismissal, the Court finds that it would continue to have ancillary jurisdiction over matters arising from the prior criminal prosecution. Federal courts "have long exercised ancillary jurisdiction in criminal matters." *Garcia v. Teitler,* 443 F.3d 202, 207 (2d Cir.2006). Often the court exercises such ancillary jurisdiction in a motion to return seized property. *Rufu v. United States,* 20 F.3d 63, 65 (2d Cir.1994); *Soviero v. United States,* 967 F.2d 791, 792 (2d Cir.1992); *Mora v. United States,* 955 F.2d 156, 158 (2d Cir.1992). Yet the reach of the court's ancillary jurisdiction is not limited to the return of seized property. *See United States v. Schnitzer,* 567 F.2d 536, 538 (2d Cir.1977) (holding that the district court had ancillary jurisdiction to have arrest record expunged and property returned after dismissal of the indictment). "At its heart, ancillary jurisdiction is aimed at enabling a court to administer 'justice within the scope of its jurisdiction.' " *Garcia,* 443 F.3d at 208 (quoting *Morrow v. District of Columbia,* 417 F.2d 728, 738 (D.C.Cir.1969)).

Within this context, federal courts have, on occasion, issued orders against third parties under the All Writs Act in criminal cases after judgment has been entered. *United States v. Abdelhadi,* 327 F.Supp.2d 587, 600 (E.D.Va.2004) (enjoining third parties from transferring, selling, or diminishing the value of the fugitive defendant's property); *United States v. Doe,* 537 F.Supp. 838, 839 (E.D.N.Y.1982) (granting an application under the All Writs Act to require the telephone company to provide toll records of the mother of a fugitive defendant).

The Supreme Court has instructed that ancillary jurisdiction is proper "to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." *Kokkonen v. Guardian Life Ins. Co. of Amer-*ica, 511 U.S. 375, 379–80, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). Indeed, the Respondent's suggestion that an official appointed in a federal criminal case be required to petition a State court to obtain relief relating to its duties flies in the face of the long established principles of comity, jurisdiction, and the expeditious resolution of disputes that have contributed to the development of ancillary jurisdiction. *See Morrow,* 417 F.2d at 738; *see also United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Hurn v. Oursler,* 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933). The exercise of ancillary jurisdiction in this case to address the issues raised by the former monitor is appropriate and well-within the Court's limited jurisdiction.

## B. The All Writs Act

■ Having found that this Court has subject matter jurisdiction over this case, the Court turns to the question of whether the All Writs Act is the proper basis and appropriate remedy to address complaints of harassment made by a court-appointed monitor. The Court starts with the language of the statute. The All Writs Act states that federal courts may "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). That includes the power to "issue such commands ... as may be necessary or appropriate to effectuate and to prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *Pennsylvania Bureau of Corr. v. United States Marshals Serv.,* 474 U.S. 34, 40, 106 S.Ct. 355, 88 L.Ed.2d 189 (1985) (quoting *New York Telephone Co.,* 434 U.S. at 174, 98 S.Ct. 364, 54 L.Ed.2d 376). The Act is designed to provide a "source of procedural instruments designed to achieve the rational ends of law," *New York Telephone Co.,* 434

U.S. at 172, 98 S.Ct. 364, 54 L.Ed.2d 376 (quotations omitted), when necessary in the federal court's "sound judgment to achieve the ends of justice entrusted to it...." *Id.* at 173, 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (quotations omitted). The Writs Act is to be applied "flexibly in conformity with these principles." *Id.* at 173, 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376; *Sprint Spectrum L.P. v. Mills,* 283 F.3d 404, 413 (2d Cir.2002).

"The Act's grant of authority is plainly broad and, on its face, makes no distinctions between parties and nonparties." *United States v. Int'l Bhd. of Teamsters,* 266 F.3d 45, 49–50 (2d Cir.2001). Importantly, the Act's reference to writs issued "in aid of ... jurisdiction" permits the court to issue orders against third parties "to the extent such parties are poised to interfere with the implementation of a prior judicial order." *United States v. Mason Tenders Dist. Council of Greater New York,* 205 F.Supp.2d 183, 188 (S.D.N.Y. 2002). Such jurisdiction may "encompass even those who have not taken any affirmative action to hinder justice." *Sprint Spectrum,* 283 F.3d at 413–14 (quoting *Association for Retarded Citizens of Connecticut, Inc. v. Thorne,* 30 F.3d 367, 370 (2d Cir.1994)). A court may issue a writ against such a third party as long as such person has the "minimum contacts" with the forum necessary to the court's exercise of personal jurisdiction. *Int'l Bhd. of Teamsters,* 266 F.3d at 50.

The Second Circuit has explained:

An important feature of the All Writs Act is its grant of authority to enjoin and bind non-parties to an action when needed to preserve the court's ability to reach or enforce its decision in a case over which it has proper jurisdiction. The power to bind non-parties distinguishes injunctions issued under the Act from injunctions issued in situations in which the activities of third parties do not interfere with the very conduct of the proceeding before the court.

*In re Baldwin–United Corp.,* 770 F.2d 328, 338 (2d Cir.1985) (citations omitted).

However, the court's use of the All Writs Act has historically been limited to that of a stop gap measure for those situations where no existing law provides the necessary remedy. *Pennsylvania Bureau of Corr.,* 474 U.S. at 40, 106 S.Ct. 355, 88 L.Ed.2d 189 (noting that the original All Writs Act included the phrase "not specifically provided for by statute" until 1948); *see also McClung v. Silliman,* 6 Wheat. (19 U.S.) 598, 5 L.Ed. 340 (1821); *McIntire v. Wood,* 7 Cranch (11 U.S.) 504, 3 L.Ed. 420 (1813). "The All Writs Act is a residual source of authority to issue writs that are not otherwise covered by statute. Where a statute specifically addresses the particular issue at hand, it is that authority, and not the All Writs Act, that is controlling." *Pennsylvania Bureau of Corr.,* 474 U.S. at 43, 106 S.Ct. at 361, 88 L.Ed.2d 189.

This limitation on the use of the All Writs Act is particularly relevant in the field of criminal law and procedure, which is heavily governed by statutes like the Federal Rules of Criminal Procedure. In this light, the Supreme Court has noted "it is difficult to conceive of a situation in a federal criminal case today where [a writ] would be necessary or appropriate." *Carlisle v. United States,* 517 U.S. 416, 429, 116 S.Ct. 1460, 1467–68, 134 L.Ed.2d 613 (1996) (quoting *United States v. Smith,* 331 U.S. 469, 475 n. 4, 67 S.Ct. 1330, 91 L.Ed. 1610 (1947)).

This limitation on the use of the All Writs Act is not applicable to the circumstances of the present criminal case. The appointment of a monitor over a corporate defendant in a criminal prosecution is a relatively extraordinary and recent devel-

opment in criminal law that is not governed by statute. *See, e.g., Cobell v. Norton,* 334 F.3d 1128, 1142 (D.C.Cir.2003) ("The Monitor was charged with an investigative, quasi-inquisitorial, quasi-prosecutorial role that is unknown to our adversarial legal system."). Similar to the United States Marshals Service, court-appointed monitors in criminal cases have special responsibilities and serve both the Executive and Judicial Branches of government. *Cf. Pennsylvania Bureau of Corr.,* 474 U.S. at 44, 106 S.Ct. at 361–62, 88 L.Ed.2d 189 (Stevens, J., dissenting). The most appropriate analogue may be found in civil law, where it is established under Rule 53 of the Federal Rules of Civil Procedure for the court to appoint a special master to monitor compliance with a remedial order. *See United States v. Yonkers Bd. of Educ.,* 29 F.3d 40, 44 (2d Cir.1994); *New York State Ass'n for Retarded Children v. Carey,* 706 F.2d 956, 962–65 (2d Cir.1983).

In the absence of a specific criminal provision for the Monitor to utilize to seek judicial relief when it is threatened, the use of the All Writs Act to enforce the Court's order seems quite appropriate. Federal courts have long been enjoining non-parties in similar civil suits involving consent decrees and special masters. *See, e.g., Int'l Bhd. of Teamsters,* 266 F.3d at 49–50 (enjoining former members of a union involved in organized crime from contacting the union); *Sheet Metal Contractors Ass'n of Northern New Jersey v. Sheet Metal Workers' Intern. Ass'n,* 157 F.3d 78, 82–83 (2d Cir.1998); *Yonkers Racing Corp. v. City of Yonkers,* 858 F.2d 855 (2d Cir.1988); *United States v. Local 1804–1, Int'l Longshoremen's Assoc.,* No. 90 Civ. 0963(JSM), 2003 WL 221851 (S.D.N.Y. Jan.30, 2003) (providing for continuing jurisdiction and applications for relief to be made under the All Writs Act); *Mason Tenders Dist. Council of Greater New York,* 205 F.Supp.2d at 188 (enjoining expelled members of international union from contacting organization's members and soliciting them to join a local under the All Writs Act); *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am.,* 911 F.Supp. 743 (S.D.N.Y.1996) (enjoining individuals, law firm, and insurance company that provided legal representation and insurance services to local unions pursuant to the All Writs Act).

The Second Circuit's decision in *Int'l Bhd. of Teamsters,* is instructive, and somewhat similar to this case. 266 F.3d at 49–50. That case involved a string of civil cases brought by the federal government under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964, to rid the International Brotherhood of Teamsters ("IBT") of organized crime. Pursuant to consent decrees, the government required that the IBT be reorganized and subject to oversight by court-appointed officers. An independent review board that was created by the consent decree determined that two members of the IBT were affiliated with organized crime and barred them for life from seeking employment with the IBT. Following the ouster, the two individuals took control of a separate union and attempted to enroll employees of the IBT. In response, the district court entered an order under the All Writs Act enjoining the two non-party individuals from contacting members of the IBT. The Second Circuit found that use of the All Writs Act under these circumstances was not only proper, but that the enjoining of the individuals was "necessary or appropriate" to protect the court's consent decree. *Id.* at 50–51.

It appears that the only other conceivable statutory provision that can be used to enforce the Court's order in this deferred prosecution is criminal contempt. The

controlling statute for criminal contempt provides that "[a] court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as . . . [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command." 18 U.S.C. § 401. Rule 42 of the Fed. R. of Crim. P. allows the Court to request that the United States Attorney prosecute the alleged contempt, or if such prosecution is declined, to appoint a private disinterested attorney as a special prosecutor. *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 801, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987).

The Supreme Court has stated that "this power, considered to be a part of the judicial function, is grounded first and foremost upon necessity: 'The ability to punish disobedience to judicial orders is regarded as essential to ensuring that the Judiciary has a means to vindicate its own authority without complete dependence on other branches.'" *United States v. Providence Journal Co.*, 485 U.S. 693, 693, 108 S.Ct. 1502, 1508, 99 L.Ed.2d 785 (1988) (quoting *Young*, 481 U.S. at 796, 107 S.Ct., at 2131–32, 95 L.Ed.2d 740).

Here, the provisions relating to criminal contempt sanctions are inapplicable because the Monitor is, at this time, only seeking an order enjoining the Respondents. No criminal sanctions are sought. An order pursuant to the All Writs Act appears the only proper basis for such a remedy. *See Sheet Metal Contractors*, 157 F.3d at 82–83 (holding that the All Writs Act, rather than contempt, is the proper basis for injunction of a nonparty to the original order).

The Respondents' argument that the application of the All Writs Act is inappropriate because it should only be exercised "sparingly and only in the most critical and exigent circumstances," is misplaced. In support of this argument the Respondents rely on *Wisconsin Right to Life, Inc. v. Federal Election Comm'n*, 542 U.S. 1305, 1305, 125 S.Ct. 2, 3, 159 L.Ed.2d 805 (Rehnquist, Circuit Justice 2004), a case in which former Chief Justice Rehnquist discussed the All Writs Act, but in an entirely different context. In *Wisconsin Right to Life*, Chief Justice Rehnquist, sitting alone in his capacity as a Circuit Justice, declined to issue an injunction pending appeal barring the enforcement of an Act of Congress, an authority that the Supreme Court could properly exercise under the All Writs Act, but " 'only in the most critical and exigent circumstances.'" *Id.* (quoting *Ohio Citizens for Responsible Energy, Inc. v. NRC*, 479 U.S. 1312, 1313, 107 S.Ct. 682, 93 L.Ed.2d 692 (1986)) (Scalia, Circuit Justice 1986); *see also Fishman v. Schaffer*, 429 U.S. 1325, 1326, 97 S.Ct. 14, 50 L.Ed.2d 56 (1976) (Marshall, Circuit Justice 1976).

The authority of the Court in this case to grant the relief that the Monitor seeks is derived from the same All Writs Act. However, in deciding whether to issue an order, the Court is not subject to the same stringent standard enunciated in *Wisconsin Right to Life*, which involved an application to enjoin the enforcement of a statute pending appeal. Here, the legal standard is simply whether the order is "necessary or appropriate in aid of jurisdiction" and "agreeable to the usages and principles of law." *Sheet Metal Contractors*, 157 F.3d at 84; 28 U.S.C. § 1651(a).

The claim by Stabile and Saracco that the they cannot be subject to an injunction because they have no relation to, impact with, or relevance to the underlying case against the NYRA, is also without merit. As stated above, the All Writs Act permits the court to issue orders against third parties "to the extent such parties are

poised to interfere with the implementation of a prior judicial order." *Mason Tenders Dist. Council of Greater New York,* 205 F.Supp.2d at 188; *see also In re Baldwin–United Corp.,* 770 F.2d at 338. The Second Circuit has stated that such an order may "encompass even those who have not taken any affirmative action to hinder justice." *Association for Retarded Citizens of Connecticut,* 30 F.3d at 370.

Here, there is no dispute that both Stabile and Saracco were aware that the Monitor was appointed by a federal court to ensure the NYRA's compliance with state and federal law. If Stabile and Saracco did not know of the Monitor's court-appointed status, they certainly would not have contacted the Monitor to attempt to resolve the dispute they had with the NYRA. In addition, all of the allegations in the Monitor's petition describe acts that, if true, with reasonable certainty were taken in order to exploit and perhaps influence the Monitor in its unique status under the Appointing Order. Any injunction that would be issued by the Court would necessarily be tailored to prevent such activities directed at the Monitor and its unique relationship with NYRA from occurring in the future. *See Int'l Bhd. of Teamsters,* 266 F.3d at 51 (finding that certain parts of an injunction issued against a third party were overbroad).

Precluding court-appointed monitors from petitioning federal courts for orders under the All Writs Act as provided for in *Int'l Bhd. of Teamsters,* and leaving them with no judicial remedy, would be unwise. Court-appointed monitors provide an indispensable and important service that saves both judicial and prosecutorial resources. The remedial measures and oversight that court-appointed monitors impose on corporate defendants aid in the administration of justice. A monitorship of a corporate defendant provides reasonable punishment that a court would otherwise be incapable of imposing on a corporation. These purposes are set forth in 18 U.S.C. § 3553(a)(2), and include the need to promote respect for the law, provide just punishment and adequate deterrence, protect the public from additional crimes, and provide needed correctional treatment. *See United States v. Fairclough,* 439 F.3d 76, 81 (2d Cir.2006).

Monitorships, like the one imposed on the NYRA, are tailored to achieve these goals through corporate restructuring, reform of operating practices, policies and procedures, and adequate oversight to ensure continuing compliance. Without court-appointed monitors, defendant corporate entities would only be subject to monetary fines, which are inadequate to address all of the purposes listed in the statute that provide for the imposition of a reasonable sentence.

Accordingly, the Court finds that the All Writs Act is a proper basis and appropriate remedy to address complaints of harassment made by a court-appointed monitor when the relief sought includes an injunction or restraining order. The Court now turns to the question of whether the issuance of an order is necessary or appropriate given the facts and circumstances of this case and whether a hearing is necessary to determine any disputed issues of material fact.

## C. The Propriety of issuing an Injunction in this Case

### 1. As to Respondent Saracco

 The complaint letter filed by the Monitor alleges that Saracco telephoned the monitor on April 5, 2006, and asked the Monitor to exert pressure on NYRA to reinstate Stabile's credentials. It was also alleged that Saracco stated that he was planning a lawsuit on behalf of Stabile that

might include individuals associated with the law firm of Getnick & Getnick.

At the order to show cause appearance on May 8, 2006, Saracco explained that he was a former colleague of Getnick and merely reached out to him, on behalf of his client Stabile, in a conciliatory manner hoping to avoid unnecessary litigation. Saracco also stated that he had spoken to Getnick on a prior occasion regarding Stabile's status, and during such conversation Getnick encouraged him to call again to update him on any developments. Saracco contends that at no time did the Monitor notify him that the call was unwanted, unappreciated, or in any way inappropriate. Saracco states that he has no interest, need, or desire to have any further communications with the Monitor or its associates.

The Court finds that, although the communication was certainly inappropriate, it is not necessary to enter an order barring Saracco from further communications with the Monitor. Saracco was warned by the Court that his attempt to settle his client's matter with NYRA, by communicating with a court-appointed, quasi-judicial monitor, and by threatening to initiate civil litigation, including individuals associated with the Monitor's law firm, was unwise and showed extremely poor judgment. However, having heard Saracco's explanation and his statement that he will have no further communications with the Monitor or its associates, as an attorney and officer of the court, the Court believes that this admonition is sufficient. Accordingly, the Monitor's application for an injunction against Saracco is denied.

### 2. As to Respondent Stabile

The complaint letter filed by the Monitor alleges that Stabile telephoned the Monitor just after the term of the monitorship had ended and threatened to "dissem-inate information about the Monitor, which he described and which information was false and disparaging." In addition, the Monitor argues that Stabile's recent threats directed at a member of the BAVP underscore the need for an order enjoining him from contacting the Monitor or its agents.

In response, Stabile admitted placing a call to the Monitor, but claims that the call was solicited by the Monitor and contends that the content of the single telephone call was not sufficiently serious to warrant injunctive relief.

In order to resolve these material disputes of fact, the Court must hold an evidentiary hearing to determine the content and tone of the conversation, as well as the nature and circumstances of the telephone call. Following the hearing, the Court will determine, based upon the findings of fact, whether an injunction is necessary or appropriate.

### III. CONCLUSION

Based upon the foregoing, it is hereby

**ORDERED**, that the Monitor's request for an injunction against Stephen E. Saracco, Esq., is DENIED; and it is further

**ORDERED**, that with regard to Anthony A. Stabile, an evidentiary hearing is directed to be held on the issues involved in this application for an injunction, on June 29, 2006, at 10:00 a.m., in Courtroom 1020, Long Island Federal Courthouse, Central Islip, New York.

**SO ORDERED.**